1 | William E. Peterson, Bar No. 1528
2 | Janine C. Prupas, Bar No. 9156
SNELL & WILMER L.L.P.
50 West Liberty Street, Suite 510
3 | Reno, Nevada 89501
Telephone: (775) 785-5440
4 | FAX: (775) 785-5441
wpeterson@swlaw.com
5 | jprupas@swlaw.com

6 | Jennifer R. Ecklund
Mackenzie S. Wallace
7 | John P. Atkins
THOMPSON COBURN LLP
8 | *Pro Hac Vice Forthcoming*
2100 Ross Ave., Suite 600
9 | Dallas, TX 75201
Telephone: (972) 629-7100
10 | FAX: (972) 629-7171
jecklund@thompsoncoburn.com
11 | mwallace@thompsoncoburn.com
jatkins@thompsoncoburn.com
12
*Attorneys for Plaintiff*
13

14

15 |                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
16

17 | PRIME HEALTHCARE SERVICES – RENO,          Case No. _____
LLC D/B/A SAINT MARY'S REGIONAL
18 | MEDICAL CENTER,

19 |                 PLAINTIFF,                            .

20 | vs.

21 | HOMETOWN HEALTH PROVIDERS
INSURANCE COMPANY, INC.,
22 | HOMETOWN HEALTH PLAN, INC.,
HOMETOWN HEALTH MANAGEMENT
23 | COMPANY, AND HOMETOWN HEALTH,
LLC
24
                   DEFENDANTS.
25

26

27 |                    **PLAINTIFF'S ORIGINAL COMPLAINT**

28

1

This case is about a single, simple question.  Can an insurer refuse to pay a medical provider (or pay whatever pittance it wishes) for medically necessary services provided to its insureds in good faith by a hospital simply because that hospital is not in its provider network?  The answer is *no*, an insurer must pay what its insurance plans agree to provide for such coverage, or must otherwise fairly reimburse the provider for the services rendered.  Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center ("Saint Mary's") provided such services but Defendants wrongfully denied full and fair payment for those services under those plans.  It is not a coincidence that the repeated and extensive pattern and behavior of non-payment and gross underpayment to Saint Mary's is perpetrated by an insurer (Hometown Health) that is a wholly owned subsidiary of Renown Healthcare, Saint Mary's principal competitor for the provision of heath care services in Northern Nevada.  Hometown Health and Renown share interlocking officers and directors and are operated and controlled by the same management.  Hometown Health is referred to by both Hometown Health and Renown as a mere division of Renown Health.  It is also not a coincidence that Renown was and may currently be operating under a Federal Court Decree based on and arising out of  attempts to monopolize certain health care services in Northern Nevada.  This complaint seeks to recover all sums due Saint Mary's for providing services to members or insureds of Defendants.

Hometown Health Plan, Inc., Hometown Health Management Company, and Hometown Health, LLC (collectively, "HH") have not paid or have underpaid Saint Mary's for hospital services rendered to Defendants' members, in violation of federal law, Nevada law, contract law, and principles of justice and equity.

## JURISDICTION AND VENUE

1.      This action is brought, in substantial part, under the civil enforcement provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 *et seq.*  Saint Mary's seeks to enforce rights to recover benefits attendant to ERISA plans assigned to it by patients who are insureds under ERISA plans issued, insured, and/or administered by HH.

2.      As a result, this Court has jurisdiction under 28 U.S.C. § 1331, because this case arises under the laws of the United States.

3.      This Court has supplemental jurisdiction over Saint Mary's various state law claims, which relate to state law commercial plans and fully-insured ERISA plans pursuant to 28 U.S.C. § 1367.  Saint Mary's claims in this case all relate to, all form part of the same case or controversy as, and all arise out of the same operative facts as Saint Mary's ERISA claims.

4.      This Court has personal jurisdiction over Defendants because Defendants Hometown Health Providers Insurance Company, Inc., Hometown Health Plan, Inc., and Hometown Health Management Company are Nevada corporations with principal places of business in Nevada; Hometown Health, LLC is a Nevada LLC with a principal place of business in Nevada, and on information and belief, one or more members of Hometown Health, LLC resides in Nevada. All Defendants are thus citizens of Nevada.

5.      A substantial part of the events giving rise to this claim having occurred in this Judicial District, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  Specifically, all of the relevant services for which payment is claimed  was rendered by Saint Mary's in this district, and all of Defendants' administrative work was, on information and belief, conducted in this district (since that is where all of the Hometown Health entities are headquartered and its parent corporation, Renown Health Care has its principal place of business).

## THE PARTIES

6.      Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center ("Saint Mary's") is a health care provider and limited liability company registered in Delaware and with a principal place of business in Reno, Nevada.  It can be served through the undersigned counsel of record.

7.      Defendants Hometown Health Providers Insurance Company, Inc., Hometown Health Plan, Inc., Hometown Health Management Company, and Hometown Health, LLC are related health insurance companies, three of which are domestic Nevada corporations, and one of which is a domestic Nevada LLC. On information and belief, all are involved in the issuance and administration of the plans at issue in this case. Defendants are addressed collectively as "HH" herein.

## **ALLEGATIONS COMMON TO ALL CLAIMS**

### ***Introduction***

8.      Saint Mary's operates an award-winning acute-care hospital providing critical health care services to residents of Reno, Nevada and the surrounding area.   Specifically, Saint Mary's achieved the Healthgrades 2021 America's 250 Best Hospitals Award (a distinction that places Saint Mary's among the top five percent of hospitals assessed nationwide) and was awarded as a Top 100 Hospital and Top 50 Cardiovascular Hospital by IBM Watson Health. Saint Mary's provided care that was required to either save patients' lives or address other serious medical conditions.

9.      Fundamentally, Saint Mary's entitlement to the relief sought is justified through these general facts:

   a.   First, Saint Mary's provided necessary medical services (often emergency services) to patients insured under plans underwritten or administered by HH. These services saved and improved the lives of the patients Saint Mary's helped.

   b.   Second, HH underpaid, or improperly denied payment for, the claims described in this case, pursuant to the plans HH *itself* authored, insured, and/or administered.  In so doing, HH not only underpaid Saint Mary's, it potentially subjected HH's own insureds to near full-price medical bills *even though they were insured*.

   c.   Third, Saint Mary's obtained Assignments of Benefits under each of these plans for each of the relevant insureds, and now stands in the shoes of these insureds with respect to their entitlement to benefits for the services Saint Mary's rendered.

   d.   Fourth, Saint Mary's is now entitled to proper payment under ERISA, under state contract law, under principles of equity, and under various Nevada state statutes.

10.     There are too many claims at issue to detail each one individually in this complaint without being cumulative and such is not required under Federal Rule of Civil Procedure 8 which

4

merely requires a short and plain statement of the claim.  Here, Saint Mary's claims that it is entitled to payment for over 600 unpaid or underpaid claims.  Saint Mary's has provided to HH a specific and comprehensive list and itemization of claims, with sufficient identifying information and detail for HH to identify the specific insureds and claims at issue, including details like the date of services provided, unique patient identifiers, etc., through a link contained in a demand letter sent concurrently with this lawsuit.  As such HH, by this complaint HH is fairly informed and noticed of the claims being asserted in this case.

11.    There are 690 separate denied or underpaid claims for reimbursement by Saint Mary's (the "Claims").  Some of these Claims relate to individuals insured under self-funded ERISA plans, while some relate to individuals insured under fully-insured ERISA or non-ERISA plans.  Saint Mary's has attempted to obtain information from HH regarding the ERISA status of various Claims but has been unable to obtain that information.  Consequently, Saint Mary's cannot at this time plead the proportions of each type of claim in the Claims List.  Saint Mary's can, however, clearly indicate the number of Claims that were denied *completely* versus underpaid: a total of 128 Claims were denied any reimbursement whatsoever, with HH paying *nothing* for services provided to their insured.  The remaining Claims were underpaid.

12.    Many of these claims, including denied and underpaid claims, were for emergency services, as defined under the relevant plans, Nevada law, or Federal law.

13.    HH's wrongful conduct continues to this day, and Saint Mary's will present evidence in support of all non-payments and underpayments that are continuing and may continue to the time of trial.

14.    The parties in this case have no express provider contract.  This makes Saint Mary's what is called an "Out-of-Network" or "Non-Network" or "Non-Preferred" provider of medical services to HH's members and insureds.  However, HH has a contractual relationship, either as a direct insurer or as a third party insurance administrator of insurance benefits and payments, with every single insured with regard to every service for which Saint Mary's is suing—HH issued and/or administered every insurance plan providing for the payment of services, and HH is also the primary payer (not just the third party administrator) for many of those plans.

15.     At present, and not including pre- or post-judgment interest, the amount that Saint Mary's has been underpaid for the services rendered hereunder (including amounts due for claims for services that were denied and never paid, and amounts due for claims for services that were underpaid) is $6,001,530,51.

16.     For the Claims, Saint Mary's has received signed assignments of benefits from the insureds stating the following (in these words, or in similar language with similar legal effect):

> . . . the undersigned irrevocably assigns and hereby authorizes…direct payment to the hospital . . . all private and public insurance benefits otherwise payable to or on behalf of the patient for this hospitalization or for these outpatient services and for any emergency services, if rendered, including but not limited to group medical/indemnity/self-insured ERISA benefits/coverage, PIP, UIM/UM, as well as auto-homeowner insurance.

17.     Consequently, Saint Mary's stands in the shoes of the insureds whose services HH contracted to cover, having been assigned the right to direct payment, and to all private and public insurance benefits, regardless of the plan type at issue.  Saint Mary's is therefore entitled to any amounts for which the insureds would be entitled to reimbursement.  Additionally, Saint Mary's has succeeded to all of the insureds' rights with respect to these claims under ERISA.  *Misic v. Bldg. Serv. Employees Health & Welfare Tr.*, 789 F.2d 1374, 1376 (9th Cir. 1986).

18.     Saint Mary's has collected or made reasonable efforts to collect all required copayments, coinsurance, or other cost sharing with respect to each and every claim.

19.     Saint Mary's has pursued all contractually required appeals procedures on behalf of the insureds before pursuing this litigation, or was excused from doing so due to a prior breach by HH, or was excused because any such appeals have proved to be futile in previous dealings with HH.

20.     Additionally, for the emergency services claims enumerated above, not only was Saint Mary's entitled to payment for these claims pursuant to the insureds' contracts with HH, it

was entitled to payment pursuant to a Nevada statute *requiring* health insurers to cover emergency services for this subset of emergency claims.

21.    It is common for health insurers to pay as little as they possibly can to out-of-network providers, or to deny their claims with the belief that, under the current state of the law, it is difficult or even impossible to jump through all of the necessary hoops to recover payment after the denial of the insured's contract benefit.  This situation is exacerbated when the health insured is wholly owned and operated by a Health Provider (Renown) that is the principal competitor of the provider seeking payment, and when that competing provider has engaged in pattern and practice of attempting to monopolize the provision of health care in the local market. Saint Mary's is the victim of such policies and practices and now seeks redress, under the insurance contracts to which it has succeeded as beneficiary, under state and/or federal law, and under principles of equity.  The contracts themselves are the best place to begin.

### ***The Contracts***

22.    The relevant contractual terms at issue are these: (1) for claims that were underpaid, the required coverage amounts (that is, typically, the proportion or percentage of billed charges of the out-of-network provider that the insurer agrees to pay on behalf of the insure); (2) for claims that were denied, the employment of proper procedures and standards for claim adjudication and then payment of the required coverage amounts.

23.    On information and belief, the insurance plans at issue in this matter require coverage of out-of-network services at the "usual and customary" or "reasonable and customary" or "market" rate.  All of these standards are based on what the services provided normally command in the market.  Based on single case agreements the parties have entered into, and based on Saint Mary's experience with other insurers, and its knowledge and experience in the industry, HH underpaid the Claims.  Even excluding all cases in which HH paid nothing, the average payment percentage relative to Saint Mary's billed charges for the Claims at issue is a pitiful 20.42%.

***Denied and Underpaid Non-Emergency Claims***

24.     HH denied numerous Claims for service in this case, under a variety of pretexts, including alleging that the claims were not timely filed (when they were, or when the timeliness of filing was excused); HH denied reimbursement for some services improperly because they were allegedly "post-stabilization"; and HH denied reimbursement for some services because, in HH's view, the services were not proper or were medically unnecessary.

25.     As already explained, many of the Claims for services were underpaid by the terms of HH's own insurance contracts.  Where HH deigned to pay Saint Mary's at all for the Claims, they paid an average of just over 20% of the actual billed charges.

26.     For example, one HH insured, A.W., was a severely premature newborn who received a great deal of necessary care associated with her delivery, including a significant stay in the Neonatal Intensive Care Unit, cardiology services, chemistry and hematology tests, respiratory services, and constant monitoring. This baby was extremely ill, and required a long hospital stay—over twenty days. The charges incurred were $324,507.92. Of this amount, HH paid only $36,907.68—only 11% of the reasonably incurred billed charges.

27.     Another HH insured, R.G., received an MRI, a CAT scan, and radiation therapy, totaling $46,191.43 in services, which HH reimbursed at about 8%, paying just $3,833.56; indeed, this happened to R.G. multiple times for services associated with radiation therapy, with other admissions being undercompensated at similar rates.  This repeated critical underpayment exposed R.G. to significant potential expenses from Saint Mary's.  This service was covered, and yet HH provided a vanishingly small reimbursement to the facility that took care of its insured.  HH bears contractual and statutory responsibility for this payment, not R.G., who in good faith believed her coverage was based on what her plan said and on what HH represented to her that it would pay. Saint Mary's now pursues this claim under federal law, Nevada law, principles of justice and equity, and on her behalf pursuant to her assignment of insurance benefits to Saint Mary's.

***Denied Emergency Claims***

28.     In addition to the contractual requirements in their insurance plans to cover their insureds for out-of-network services, HH was explicitly required to cover medically necessary

emergency services, under State law, or pursuant to the Affordable Care Act (or both) under all of the plans at issue in this case. NEV. REV. STAT. ANN. § 695G.170 (West).

29.     Under the Affordable Care Act and the regulations implementing it, HH must cover "emergency services" provided by out-of-network providers in a manner consistent with the coverage provided for in-network providers. 29 C.F.R. § 2590.715-2719A. Coverage for such services must be the greatest of the following three amounts: (1) "the amount negotiated with in-network providers for the emergency service furnished, excluding any in-network copayment or coinsurance imposed with respect to the participate or beneficiary;" (2) "the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount), excluding any in-network copayment or coinsurance imposed with respect to the participant or beneficiary;" or (3) "The amount that would be paid under Medicare (part A or part B of title XVIII of the Social Security Act, 42 U.S.C. 1395 et seq.) for the emergency service, excluding any in-network copayment or coinsurance imposed with respect to the participant or beneficiary." 29 C.F.R. § 2590.715-2719A(b)(3)(i).

30.     Under Nevada State Law, coverage for emergency care is required regardless of whether the Hospital is in- or out-of-network. "Medically necessary emergency services" are defined as:

> …health care services that are provided to an insured by a provider of health care after the sudden onset of a medical condition that manifests itself by symptoms of such sufficient severity that a prudent person would believe that the absence of immediate medical attention could result in:
>
> (a) Serious jeopardy to the health of an insured;
> (b) Serious jeopardy to the health of an unborn child;
> (c) Serious impairment of a bodily function; or
> (d) Serious dysfunction of any bodily organ or part.

31.     Therefore, each and every time HH denied coverage for emergency services pursuant to a plan for a claim , it violated the law (either state law, federal law, or both) and its own insurance contracts.

32.     Saint Mary's is entitled to payment for these services for at least four independent reasons:

a.  First, because these denials violated the relevant insurance agreements, the benefits of which have been assigned to Saint Mary's.

b.  Second, because even if the relevant insurance plans were construed as not requiring coverage of these emergency services by their express terms, pursuant to Nevada law, "a health care plan subject to the provisions of this section that is delivered, issued for delivery, or renewed on or after October 1, 1999, has the legal effect of including the coverage required by this section, and any provision of the plan or renewal which is in conflict with this section is void." NEV. REV. STAT. ANN. § 695G.170 (West).  All plans relating to all the Claims in this case were issued or renewed after October 1, 1999, and all Claims in this case are governed by this statute.  As the successor to all contract rights of the insureds relating to the Claims, Saint Mary's is entitled to assert claims for coverage of these denied emergency services as contract claims.

c.  Third, because the Nevada Emergency Care Statutes provide a right of private action on the part of the health care provider. And,

d.  Fourth, because for any of those group plans that cover emergency services *at all*, the Affordable Care Act requires that they cover emergency services provided by out-of-network hospitals whether or not the contract or state law provides for same, and this right may be pursued either in contract or through ERISA.

***Underpaid Emergency Claims***

33.  HH also underpaid many emergency care claims for services, in contravention of both HH's own contracts, Nevada law, and the Affordable Care Act.

34.  First, the relevant insurance documents require that Saint Mary's be compensated at the usual and customary rate, or at a similar market rate, for the services it provided.  By paying *at all*, HH conceded that these claims were properly payable, but they have not paid the amounts due under law for the services Saint Mary's provided.

35.     Second, the Nevada Emergency Care Statutes require payment at more than the *de minimus* amount than was provided by HH.

36.     Third, the Affordable Care Act, as explained above, requires that HH be compensated at the *greatest of* HH's in-network rate, the usual and customary out-of-network rate, or the Medicare rate.  29 C.F.R. § 2590.715-2719A(b)(3)(i).

37.     HH underpayments were far below the amounts required by the contracts, Nevada law, or the Affordable Care Act.

38.     For example, in one claim, involving patient D.M., the reasonable billed charges for the complicated services the patient required for stabilization amounted to $78,369.10.  D.M. received critical emergency services in order to stabilize him to enable transport to another facility that could repair an aortic dissection.  HH paid a tiny fraction (about 3%) of this amount, only $2,296.78.  Insurance covered these services, D.M. received these services, and HH paid essentially none of the costs its insured incurred, potentially exposing D.M. to tens of thousands of dollars of uncovered charges.  Rather than further victimize HH's insured, however, Saint Mary's seeks to exercise its assignment of benefits from D.M. and pursue this underpayment from HH—who should have appropriately paid Saint Mary's in the first place.

39.     In another claim, involving patient P.M., the reasonable billed charges for the service provided were $148,644.79.  HH decided these services were covered and paid the claim—but only in the amount of $15,865.31 or about 10.7% of the value of the services P.M. required and received, which included significant emergency medical interventions including multiple diagnostics and an angioplasty.  Again, Saint Mary's seeks payment for this service from HH, the party responsible for paying it, rather than from HH's insured, who reasonably believed the full amount was covered and is not responsible for his insurer's payment of only a tiny fraction of the value of the services he needed.

### *Violations of ERISA or Duties Arising Thereunder*

40.     For each and every underpayment or improper denial alleged herein that arises under an ERISA plan, HH has violated ERISA; specifically, HH has violated HH's duty to HH's insureds by not paying claims which were covered, and by underpaying claims which were covered

at a higher level than HH paid.  An ERISA beneficiary has a cause of action under ERISA to recover wrongfully denied benefits.  29 U.S.C. § 1132(a)(1)(B).  Pursuant to the Assignments of Benefits each insured signed, Saint Mary's stands in the shoes of those insureds.  Saint Mary's is entitled to the amounts that would have been paid had these claims been properly accepted and paid.

***Appeals and Exhaustion***

41.    Saint Mary's has complied with all relevant appeals provisions under the relevant benefit plans, or was excused from performing same due to a prior breach of the patient's insurance contract by HH, or because any such appeal would have been futile.

42.    Saint Mary's has exhausted all remedies required under applicable law prior to this litigation, or was excused from so doing.

## CAUSES OF ACTION

**Count 1 – Failure to Comply with Health Benefit Plans in Violation of ERISA**

***Applies to Claims Arising From ERISA Plans***

43.    Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

44.    Saint Mary's is entitled to enforce the terms of the health insurance plans, as assignee of patients/members under 29 U.S.C. § 1332(a)(1)(B), for whom HH has made claims determinations without following the applicable plan language and in an arbitrary fashion, and to obtain appropriate relief under such provision.  Under § 502(a) of ERISA, Saint Mary's (as beneficiary and assignee) is entitled to recover benefits due to it and/or the patients from whom Saint Mary's received Assignments of Benefits, under the terms of the plans between the patients and HH.

45.    Saint Mary's provided emergency services to the HH members at issue that are covered at the usual and customary rate under the terms of their respective benefit plans.  However, HH failed to adjudicate and pay those claims in accordance with those agreements.  As explained above, the majority of those benefit plans required HH to reimburse an out-of-network emergency service provider such as Saint Mary's at the usual and customary rate, but HH did not do so.

Instead, HH paid Saint Mary's amounts that were well below the usual and customary rate in the relevant geographic area.

46.     This not only violated the terms of the plans themselves, but for those claims involving the provision of emergency services, it also violated the Affordable Care Act, which required reimbursements to be made at the highest of HH's in-network rate, the usual and customary out-of-network rate, or the Medicare rate.   29 C.F.R. § 2590.715-2719A(b)(3)(i). ERISA incorporates these requirements of the Affordable Care Act with respect to group health plans.  29 U.S.C. § 1185d.  Thus Saint Mary's has the right to recover these underpaid benefits under ERISA section 502(a)(1)(B) as well.

47.     For the denied claims, as described above, HH breached the terms of those patients' health insurance plans by failing to pay Saint Mary's for the medically necessary services that Saint Mary's provided to HH insureds.  Those services were covered under the terms of the patients' health insurance plans, and Saint Mary's should have been paid for providing them.  HH's failure to pay Saint Mary's for these services has resulted in damages to Saint Mary's equal to the amount payable for those services under the terms of those patients' health insurance plans.

48.     HH breached the terms of the plans by making claims determinations that had no basis in the plan terms, without valid evidence or information to substantiate such determinations and departures from the terms of the applicable plans, and/or in an arbitrary fashion.

49.     As a proximate result of HH's wrongful acts, Saint Mary's has been damaged in an amount in excess of the jurisdictional limits of this Court.  Saint Mary's seeks to recover all unpaid and underpaid benefits that are owed to it under the terms of the patient benefit plans for providing covered emergency services to HH's members.

### Count 2 – Breach of Contract

#### *Applies to All Claims*

50.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

51.     HH's insurance plans provide for payment of emergency services at the usual and customary rate, including to out-of-network providers such as Saint Mary's.  Each of the HH

insureds for whom Saint Mary's provided emergency services validly assigned his or her health insurance plan benefits to Saint Mary's as part of their conditions of admission paperwork.  Thus, Saint Mary's stands in the insured's shoes and has standing to assert all rights that HH owes to each insured under his or her health insurance plan.

52.     Despite agreeing in the health insurance plans it issues to cover emergency care by out-of-network providers at the usual and customary rate, HH has failed to fulfill those obligations. Saint Mary's is entitled to recover the difference between the amount HH paid, if anything, for emergency care that Saint Mary's provided to HH's insureds and the usual and customary rate, as well as its costs and attorneys' fees.

53.     Moreover, for the denied claims pleaded above, HH breached the terms of those patients' health insurance plans by failing to pay Saint Mary's for the medically necessary emergency services that Saint Mary's provided to HH's insureds.  Those emergency services were covered under the terms of the patients' health insurance plans, and Saint Mary's should have been paid for providing them.  HH's failure to pay Saint Mary's for these services has resulted in damages to Saint Mary's equal to the amount payable for those services under the terms of those patients' health insurance plans.

## Count 3 – Contract Implied-in-Law (In the Alternative)

### *Applies to All Claims*

54.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

55.     Federal and state laws support an implied-in-law contract whereby Saint Mary's was legally required to provide services and care to the members that arose through the emergency room, upon which HH became legally required to pay Saint Mary's directly for such services rendered to HH's members.

56.     Under the federal Emergency Medicaid Treatment and Active Labor Act ("EMTALA") and Social Security Act § 1867(a), Saint Mary's is required to provide emergency services and care to all individuals, including members of HH, who present themselves at its emergency department with potentially life-threatening conditions, without regard to the patients'

ability to pay or their possession of insurance benefits.   Likewise, NEV. REV. STAT. ANN. § 439B.410 requires hospitals to provide emergency services regardless of the financial status of the patient.   Furthermore, discharging emergency room patients immediately after their condition has stabilized when they are still in need of further inpatient medical care would cause further imminent harm, and HH has an obligation to its members to provide access to post-stabilization medical services, and to reimburse medical providers for the costs of such services.

57.   The common law also imposes an implied-in-law contract to pay for the services that a defendant has indicated through words or deeds that defendant would pay for.   Based on the verifications, authorizations, and representations obtained from HH regarding each of the patients, HH bears financial responsibility to pay for the services that Saint Mary's rendered to the patients at issue.   Through such industry standard verifications, authorizations, and representations provided by HH in the ordinary course of business, HH represented to Saint Mary's that the services at issue would be paid for by HH.   Moreover, HH demonstrated its acknowledgement of a duty to pay for the majority of the services by paying or causing payment of something on them.

58.   Through the above-described course of conduct, HH and Saint Mary's have demonstrated their mutual agreement and understanding that HH will reimburse Saint Mary's at the usual and customary rate for any emergency services rendered to HH members, and that Saint Mary's will accept reimbursement at the usual and customary rate as payment in full for the provision of such emergency services.   Accordingly, the parties have formed an enforceable implied-in-fact contract.

59.   However, after Saint Mary's rendered emergency medical services to HH's members, HH paid to Saint Mary's amounts significantly less than the usual and customary rates for the services rendered, or nothing at all.

60.   HH's failure to reimburse Saint Mary's at a usual and customary rate constitutes a breach of the parties' implied-in-fact contract.

61.   Consequently, Saint Mary's seeks damages for the breach, in the amount of the difference between the usual and customary rates and the amounts HH has paid, if anything, for emergency services that Saint Mary's rendered to HH's members.

### Count 4 – Unjust Enrichment/Quantum Meruit (In the Alternative)

### *Applies to All Claims*

62.    Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

63.    Saint Mary's rendered valuable emergency services to HH's members.  For the patients who received post-stabilization services from Saint Mary's, HH either authorized the services explicitly, and/or authorized them implicitly by not arranging for transfer to another hospital, and thus, is deemed to have authorized the services.  Furthermore, for the non-emergency claims, HH either authorized Saint Mary's to provide (following requests by Saint Mary's) authorization, or told Saint Mary's that no authorization was needed for Saint Mary's to provide the non-emergency services.

64.    HH received the benefit of having its healthcare obligations to its plan members discharged and its members received the benefit of the medical care provided to them by Saint Mary's.

65.    As an insurer, HH was reasonably aware that medical service providers, including Saint Mary's, would expect to be paid by HH for the emergency services provided to its members.  Indeed, as pled, this obligation is codified in the Nevada Insurance Code and accompanying regulations and was impliedly agreed to by the parties.  HH has an obligation to its members to provide access to medical services and to reimburse medical providers for the cost of those services.

66.     HH accepted the benefit of the services provided by Saint Mary's to members of its health plan (and certainly accepted the premiums paid by those members).  However, HH has arbitrarily and unilaterally reimbursed Saint Mary's at amounts far lower than the value of the services provided by Saint Mary's and lower than the rates it is obligated to pay under its members' individual coverage plans.  Moreover, HH has also denied other claims and wholly failed to reimburse Saint Mary's for the services it provided to HH's members.

67.    HH misappropriated the benefits from the services performed by Saint Mary's to HH's members, the value of which HH has retained by failing to pay for the reasonable value of such services, and the retention of which would be inequitable.

68.     Therefore, Saint Mary's is entitled to *quantum meruit* recovery.

69.     As a result of HH's actions, Saint Mary's has been damaged and is entitled to recover the difference between the amount HH paid, if anything, for the emergency care Saint Mary's rendered to HH's members and the reasonable value of the services that Saint Mary's rendered to HH by discharging its obligations to HH's plan members.

### Count 5 – Violation of Nevada Emergency Care Statutes[1]

### *Applies to Emergency Claims*

70.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

71.     HH is an "Insurer" under the Nevada Insurance Code.  NEV. REV. STAT. ANN. § 679A.100.  Saint Mary's is an out-of-network provider who has provided emergency care to HH's members.

72.     Section 695G.170 of the Nevada Insurance Code requires HH to "provide coverage for medically necessary emergency services provided at any hospital" and thus to pay for emergency care provided by out-of-network providers such as Saint Mary's.  HH is required to provide such coverage of emergency care to out-of-network providers at the usual and customary rate.  *See* NEV. REV. STAT. ANN. § 439B.748.

73.     HH has failed to fulfill its obligations under the Nevada Insurance Code by failing to pay for emergency care at the usual and customary rate on the claims submitted by Saint Mary's for emergency care rendered to HH's members.  Saint Mary's damages are beyond what any ERISA plan would have covered due to HH's administration.

74.     Saint Mary's is entitled to recover the difference between the usual and customary rate and the amount HH has paid, if anything, for the emergency services that Saint Mary's rendered to HH's members.

---

[1] The "Nevada Emergency Care Statutes" referenced herein include sections 679A.100 and 695G.170 of the Nevada Insurance Code and section 439B.748 of the Nevada Revised Statutes.

## Count 6 – Violation of the Nevada Prompt Payment Statutes

### *Applies to All Claims*

75.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

76.     The Nevada Insurance Code requires an insurer to pay a health care provider's claim within 30 days of receipt of an electronically submitted clean claim.  NEV. REV. STAT. ANN. § 683A.0879.

77.     Despite this obligation, HH has taken far longer than 30 days to adjudicate and pay Saint Mary's clean claims, even when it underpaid those claims.  Indeed, HH's delays in processing and paying Saint Mary's claims have increased over time, and a number of claims are currently pending with HH that Saint Mary's filed more than 30 days ago.  Saint Mary's has even noticed HH of its delay in processing HH's claims, but to no avail.

78.     For all claims payable by plans that it insures that HH failed to pay within 30 days, HH is liable to Saint Mary's for interest.  NEV. REV. STAT. ANN. § 683A.0879.  Saint Mary's seeks interest payable to it for late-paid claims under these statutes.

## CONDITIONS PRECEDENT

79.     All conditions precedent have been performed or have occurred.

## ATTORNEYS' FEES

80.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein and further incorporates the allegations of 80 to 83 in all of the general allegations and all of the specific claims herein.

81.     Saint Mary's has been required to retain counsel to pursue its claims in this litigation.

82.     Pursuant to 29 U.S.C. § 1332(g), NEV. REV. STAT. ANN. § 18.010, and Fed. R. Civ. P. 54(c), Saint Mary's is entitled to an award of attorneys' fees.

## JURY DEMAND

83.     Saint Mary's hereby demands a trial by jury of the above-styled action for all claims for which a jury is available.

## **CONCLUSION**

Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center hereby requests that HH be cited to appear and answer this Complaint and that upon final trial and determination thereof, judgment be entered in favor of Plaintiff awarding Plaintiff the following relief:

A.  Monetary damages equaling the difference between the amount HH already paid, if anything, on the health care claims at issue and the usual and customary rate;

B.  An award of interest pursuant to NEV. REV. STAT. ANN. § 683A.0879;

C.  Quantum meruit recovery;

D.  Reasonable attorneys' fees;

E.  Court costs;

F.  Pre-judgment and post-judgment interest; and

G.  Such other and further relief to which the Plaintiff may be entitled.

Dated: May 14, 2021                                    SNELL & WILMER L.L.P.


By:  */s/ Janine C. Prupas*

William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
50 West Liberty Street, Suite 510
Reno, Nevada  89501

*Attorneys for Plaintiff*