William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
SNELL & WILMER L.L.P.
50 West Liberty Street, Suite 510
Reno, Nevada 89501
Telephone: (775) 785-5440
FAX: (775) 785-5441
wpeterson@swlaw.com
jprupas@swlaw.com

Jennifer R. Ecklund *admitted pro hac vice*
Mackenzie S. Wallace *admitted pro hac vice*
John P. Atkins *admitted pro hac vice*
THOMPSON COBURN LLP
2100 Ross Ave., Suite 600
Dallas, TX 75201
Telephone: (972) 629-7100
FAX: (972) 629-7171
jecklund@thompsoncoburn.com
mwallace@thompsoncoburn.com
jatkins@thompsoncoburn.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| PRIME HEALTHCARE SERVICES – RENO, LLC D/B/A SAINT MARY'S REGIONAL MEDICAL CENTER,<br><br>PLAINTIFF,<br><br>vs.<br><br>HOMETOWN HEALTH PROVIDERS INSURANCE COMPANY, INC., HOMETOWN HEALTH PLAN, INC., AND HOMETOWN HEALTH MANAGEMENT COMPANY,<br><br>DEFENDANTS. | Case No. 3:21-cv-00226-MMD-CLB<br><br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT** |

4892-2091-3159

This case is about a single, simple question. Can an insurer refuse to pay a medical provider (or pay whatever pittance it wishes) for medically necessary services provided to its insureds in good faith by a hospital simply because that hospital is not in its provider network? The answer is *no*, an insurer must pay what its insurance plans agree to provide for such coverage, or must otherwise fairly reimburse the provider for the services rendered. Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center ("Saint Mary's") provided such services but Defendants wrongfully denied full and fair payment for those services under those plans. It is not a coincidence that the repeated and extensive pattern and behavior of non-payment and gross underpayment to Saint Mary's is perpetrated by an insurer (Hometown Health) that is a wholly owned subsidiary of Renown Healthcare, Saint Mary's principal competitor for the provision of heath care services in Northern Nevada. Hometown Health and Renown share interlocking officers and directors and are operated and controlled by the same management. Hometown Health is referred to by both Hometown Health and Renown as a mere division of Renown Health. It is also not a coincidence that Renown was and may currently be operating under a Federal Court Decree based on and arising out of attempts to monopolize certain health care services in Northern Nevada. This First Amended Complaint (the "1AC") seeks to recover all sums due Saint Mary's for providing services to members or insureds of Defendants.

Hometown Health Providers Insurance Company, Inc. and Hometown Health Plan, Inc. (collectively, "HH") have not paid or have underpaid Saint Mary's for hospital services rendered to Defendants' members, in violation of federal law, Nevada law, contract law, and principles of justice and equity.

Since the Original Complaint and pursuant to the Court's Order [Dkt. No. 55], HH has produced to Saint Mary's four plans (the "Four Benefit Plans"), related to four exemplar claims described in the Original Complaint and herein. These plans confirm what Saint Mary's contended in its Original Complaint: Saint Mary's was systematically undercompensated or improperly denied compensation for the claims at issue in this case. This 1AC, among other things, directly attaches the full list of claims at issue in this case as an exhibit (filed under seal to protect private health information) and incorporates additional information and allegations based on HH's

4892-2091-3159

production of the Four Benefit Plans, and further analysis of available information regarding HH plans in general.

## JURISDICTION AND VENUE

1. This action is brought, in substantial part, under the civil enforcement provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 *et seq.* Saint Mary's seeks to enforce rights to recover benefits attendant to ERISA plans assigned to it by patients who are insureds under ERISA plans issued, insured, and/or administered by HH.

2. As a result, this Court has jurisdiction under 28 U.S.C. § 1331, because this case arises under the laws of the United States.

3. This Court has supplemental jurisdiction over Saint Mary's various state law claims, which relate to state law commercial plans and fully-insured ERISA plans pursuant to 28 U.S.C. § 1367. Saint Mary's claims in this case all relate to, all form part of the same case or controversy as, and all arise out of the same operative facts as Saint Mary's ERISA claims.

4. This Court has personal jurisdiction over Defendants because Defendants Hometown Health Providers Insurance Company, Inc. and Hometown Health Plan, Inc. are Nevada corporations with principal places of business in Nevada. All Defendants are thus citizens of Nevada.

5. A substantial part of the events giving rise to this claim having occurred in this Judicial District, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Specifically, all of the relevant services for which payment is claimed was rendered by Saint Mary's in this district, and all of Defendants' administrative work was, on information and belief, conducted in this district (since that is where all of the HH entities are headquartered and Renown Health Care (HH's parent corporation) has its principal place of business).

## THE PARTIES

6. Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center ("Saint Mary's") is a health care provider and limited liability company registered in Delaware and with a principal place of business in Reno, Nevada. It can be served through the undersigned counsel of record.

4892-2091-3159

7.     Defendants Hometown Health Providers Insurance Company, Inc. and Hometown Health Plan, Inc. are related health insurance companies and domestic Nevada corporations. On information and belief, all are involved in the issuance and administration of the plans at issue in this case. Defendants are addressed collectively as "HH" herein.

## ALLEGATIONS COMMON TO ALL CLAIMS

### *Introduction*

8.     Saint Mary's operates an award-winning acute-care hospital providing critical health care services to residents of Reno, Nevada and the surrounding area. Specifically, Saint Mary's achieved the Healthgrades 2021 America's 250 Best Hospitals Award (a distinction that places Saint Mary's among the top five percent of hospitals assessed nationwide) and was awarded as a Top 100 Hospital and Top 50 Cardiovascular Hospital by IBM Watson Health. Saint Mary's provided care that was required to either save patients' lives or address other serious medical conditions.

9.     The parties in this case have no express provider contract. This makes Saint Mary's what is called an "Out-of-Network" or "Non-Network" or "Non-Preferred" or "Non-Participating" provider of medical services to HH's members and insureds. As a non-participating provider, Saint Mary's has no pre-existing agreement with HH to accept any particular rates as payment in-full. This does not prevent Saint Mary's from treating HH's members, however; nor does it preclude HH's members from obtaining reimbursement for care rendered at Saint Mary's. Indeed, patients in need of emergency care will often present to the nearest hospital, regardless of network status.

10.     This is because HH has a contractual relationship, either as a direct insurer or as a third party insurance administrator of insurance benefits and payments, with every single insured with regard to every service for which Saint Mary's is seeking reimbursement here—HH issued and/or administered every insurance plan providing for the payment of services, and HH is also the primary payer (not just the third party administrator) for many of those plans.

11.     Fundamentally, Saint Mary's is entitled to reimbursement and relief from this Court for the following reasons:

a. First, Saint Mary's provided necessary medical services (often emergency services) to patients insured under HH plans. Saint Mary's services saved and improved the lives of the patients at issue.

b. Second, HH underpaid, or improperly denied payment for, the claims described in this case pursuant to the plans HH *itself* authored, insured, and/or administered. In so doing, HH not only underpaid Saint Mary's, it potentially subjected HH's own insureds to near full-price medical bills *even though they were insured and contracted for out-of-network coverage*.

c. Third, Saint Mary's obtained Assignments of Benefits under each of these plans for each of the relevant insureds, and now stands in their shoes with respect to their entitlement to benefits for the services rendered.

d. Fourth, Saint Mary's is now entitled to proper payment under ERISA, state contract law, principles of equity, and various Nevada state statutes.

12. As the Court is aware, different types of health products, plans, and agreements between the parties as provider and insurer create different types of claims and causes of action. While only HH knows for certain at this juncture, the Claims at issue may be underwritten by the following types of funding arrangements (or others unknown to Saint Mary's at this time):

a. Individual health plans: health insurance policies that individuals purchase, often on the Affordable Care Act ("ACA") exchange (the "Individual Plan");

b. Fully-insured ERISA plans: employer-sponsored health insurance where the employer insures the policies through an insurance company (the "Fully-Insured ERISA Plans");

c. Self-insured ERISA plans: employer-sponsored health benefit plans where the employer underwrites the benefits and third-party administrator administers the plan (the "Self-Funded ERISA Plans"); and

d. State and local government plans: university, city, or local government employer health plans where the insurance company administers but does not underwrite the plan (the "State and Local Government Plans").

4892-2091-3159

13.     The funding arrangements dictate the causes of action available to Saint Mary's for each Claim.  For example, claims pursuant to Fully-Insured ERISA Plans are subject to state law cause of action and thus are subject to Saint Mary's contract and state statutory causes without any ERISA preemption analysis required.  On the other hand, claims pursuant to Self-Funded ERISA Plans require analysis of ERISA preemption to determine which causes of action apply, but at the very least a claim for denied ERISA benefits is appropriate.  Claims under Individual Plans are subject to state law and *not* subject to causes of action for ERISA benefits, though federal law creates certain requirements for these plans under the Affordable Care Act.

### *The Claims*

14.     Saint Mary's asserts that it is entitled to payment for 690 unpaid or underpaid claims (the "Claims").  Due to the volume of the Claims at issue, Saint Mary's does not and cannot meaningfully, individually, detail each claim for reimbursement herein because the 1AC would be overly duplicative, cumulative, and confusing (and because such detail is not required under Federal Rule of Civil Procedure 8 which merely requires a short and plain statement of the claim).  Instead, details specific to each claim are provided in Exhibit A (the "Claims List"), which is incorporated into this 1AC, while the general contexts and contents of the claims are grouped herein to the extent possible.[1]  Saint Mary's served the list it now appends as Exhibit A to HH after filing its Original Complaint, so HH has at all times had adequate knowledge of, and notice regarding, the specific claims at issue in this case.

15.     The *only* claims at issue in this case are the 690 claims set forth in Exhibit A to this 1AC, which has been filed under seal for the protection of patient privacy and in order to maintain patients' rights under the Health Insurance Portability and Accountability Act (HIPAA).  As Exhibit A demonstrates, the admission dates for the claims range from January 6, 2014 until December 31, 2019; and the discharge dates for these claims range from January 7, 2014 until December 31, 2019.  The patient names, admission dates, discharge dates, patient dates of birth, patient types, certain insurance information, policy number information, charges, payments, and balances due to Saint Mary's are included in Exhibit A for each of the Claims and incorporated

---

[1] *See* the Claims List dated May 17, 2021, attached hereto as **Exhibit A**.

into this 1AC as though fully set forth herein.  Although Saint Mary's expressly maintains its right to further amend its operative complaint by permission of the Court, these are the *only* claims at issue in this case.  *For the sake of clarity, any other references in the 1AC to continuing investigation, potential additional claims, or continuing improper conduct by HH, relate only to the possibility of further amendment as further underpayments or denials are discovered, and do not imply that any other or additional claims are at issue.*

16.     When patients present to Saint Mary's (typically through the emergency room), they ordinarily present their insurance cards during their initial visit, which lists contact information for HH only.  At best (and in limited instances), the cards may contain a short-hand name for the employer of the insured, but no contact information.  Thus, it is impossible to discern the identity of any plan administrator based upon the insurance card alone, or based upon any other source of insurance documentation available to Saint Mary's at the time the patients present for care.  Saint Mary's does not have information regarding the funding arrangement of the claims or access to such information—including the funding status or plan benefit information.  Thus, some of the Claims relate to individuals insured under Self-Funded ERISA Plans, while others relate to individuals insured under Fully-Insured ERISA Plans, or non-ERISA plans—none of which is known or evident to Saint Mary's at the time a patient presents for care

17.     Saint Mary's has attempted to obtain information from HH regarding the ERISA status of various Claims but has been unable to obtain that information to date.  Despite making significant requests for plan documents and plan information about HH's reimbursement methodology over the past several years with regard to the subject Claims, HH consistently failed to provide any of the requested documents or information to Saint Mary's.  Specifically,  after serving a demand letter upon HH in 2018, Saint Mary's counsel began attempts to obtain (1) the funding status of each of the Claims, and (2) the plan documents related to each of the Claims.  Despite Saint Mary's efforts and requests to obtain this information over the past several years (and other than the four plan documents ordered pursuant to Dkt. No. 55), HH has failed to provide the requested information and documents to Saint Mary's.  At all relevant times, both before and after this lawsuit commenced, Saint Mary's never had access to the operative plan documents or

summaries thereof—until the Court ordered HH in this case to produce four plans. Consequently, Saint Mary's cannot at this time plead the information specific to the documents or funding arrangements for the Claims, because they are proprietary information of HH. In fact, Saint Mary's can only identify them for the four plans produced *under seal*, because HH maintains even now that that information is confidential.

18. Saint Mary's can, however, clearly indicate the number of Claims that were denied *completely* versus underpaid: a total of 128 Claims were denied any reimbursement whatsoever, with HH paying *nothing* for services provided to their insured. The remaining Claims were underpaid.

19. In addition, the Claims are likely to fall into different causes-of-action-categories depending on the plan type and funding arrangement—something that Saint Mary's can only determine for the four claims for which HH has provided plan documents (due to the Court's order). Many of these claims, including denied and underpaid claims, were for emergency services, as defined under the relevant plans, Nevada law, or Federal law. This is important because coverage of emergency services is required under any of the relevant law that may apply.

20. At present, and not including pre- or post-judgment interest, the amount that Saint Mary's has been underpaid for the services rendered hereunder (including amounts due for claims for services that were denied and never paid, and amounts due for claims for services that were underpaid) is $6,001,530.51.

21. It is (and during the period applying to the claims, from 2014 to 2019, it was) the policy of Saint Mary's to obtain assignments of benefits from patients. Therefore, for the Claims at issue, Saint Mary's has received signed assignments of benefits ("AOBs") from the insureds that state the following (in these words, or in similar language with similar legal effect):

> . . . the undersigned irrevocably assigns and hereby
> authorizes…direct payment to the hospital . . . all private and public
> insurance benefits otherwise payable to or on behalf of the patient
> for this hospitalization or for these outpatient services and for any
> emergency services, if rendered, including but not limited to group

medical/indemnity/self-insured  ERISA  benefits/coverage,  PIP, UIM/UM, as well as auto-homeowner insurance.

22.    Consequently, Saint Mary's stands in the shoes of the insureds whose services HH agreed to cover, and was assigned the right to direct payment, and to all private and public insurance benefits, regardless of the plan type at issue.  Saint Mary's is therefore entitled to any amounts for which the insureds would be entitled to reimbursement.  Additionally, Saint Mary's has succeeded to all of the insureds' rights with respect to these claims under ERISA.  *Misic v. Bldg. Serv. Employees Health & Welfare Tr.*, 789 F.2d 1374, 1376 (9th Cir. 1986).

23.    Saint Mary's has collected or made reasonable efforts to collect all required copayments, coinsurance, or other cost sharing with respect to each and every claim.

24.    Saint Mary's pursued all contractually required appeals procedures on behalf of the insureds before pursuing this litigation, or was excused from doing so due to a prior breach by HH, or was excused because any such appeals have proved to be futile in previous dealings with HH.

25.    Additionally, for the emergency services claims enumerated above, not only was Saint Mary's entitled to payment for these claims pursuant to the insureds' contracts with HH, it was entitled to payment pursuant to a Nevada statute *requiring* health insurers to cover emergency services for this subset of emergency claims.

26.     It is common for health insurers to pay as little as they possibly can to out-of-network providers, or to deny their claims with the belief that, under the current state of the law, it is difficult or even impossible to jump through all of the necessary hoops to recover payment after the denial of the insured's contract benefit.  This situation is exacerbated when the health insurer is wholly owned and operated by a Health Provider (Renown) that is the principal competitor of the provider seeking payment, and when that competing provider has engaged in pattern and practice of attempting to monopolize the provision of health care in the local market.  Saint Mary's is the victim of this conduct and now seeks redress, under the insurance contracts to which it has succeeded as beneficiary, under state and/or federal law, and under principles of equity.  The contracts themselves are the best place to begin.

### ***The Contracts***

27.     The relevant contractual terms at issue are: (1) for claims that were underpaid, the required coverage amounts (that is, typically, the proportion or percentage of billed charges of the out-of-network provider that the insurer agrees to pay on behalf of the insure); and/or (2) for claims that were denied, the description of proper procedures and standards for claim adjudication and the resulting payment of the required coverage amounts.

28.     The Four Benefit Plans confirm, as Saint Mary's previously pleaded, that HH's insurance plans require coverage of medically necessary out-of-network services at the "usual and customary" rate or at a rate derived therefrom.  For example, under one of the plans HH has now produced—a Preferred Provider Organization ("PPO") plan:

"

"[2]

Further, the "

"[3]

29.     Moreover, even under a Health Maintenance Organization ("HMO") plan, which typically provide for coverage only of "

---

[2] Exhibit B at HTH000232.  Attached as **Exhibit B** to this 1AC is the pdf HH produced in response to this Court's order.  HH has represented that that document contains the four plans relating to the four individual case examples that Saint Mary's gave in its Original Complaint.  The plans are divided as follows, according to HH's communication to counsel for Saint Mary's: Orig. Compl. ¶ 26 [now at 1AC ¶ 52]: HTH000001–120; Orig. Compl. ¶ 27 [now at 1AC ¶ 41]: HTH000121–226; Orig. Compl. ¶ 38 [now at 1AC ¶ 57]: HTH000227–388; Orig. Compl. ¶ 39 [now at 1AC ¶ 59]: HTH000389–667].
[3] Exhibit B at HTH000233-34.

4892-2091-3159

,,[5]

30.    Thus, for the claims specifically identified at paragraphs 41, 52, 57, and 59 below, the Four Benefit Plans confirm that (1) medically necessary out-of-network emergency care is covered, usually at the usual and customary rate or at a high fraction thereof,[6] (2) where prior authorization is obtained, medically necessary out-of-network elective services are also covered, and for certain plans, authorization is not required and out-of-network services are generally available and compensated at a proposition of the usual, customary and reasonable or usual and customary rate.  The Four Benefit Plans confirm that HH is under a contractual obligation to cover the Claims.

31.    Absent the discovery ordered by the Magistrate in this matter for specific claims at issue in the Original Complaint, the only exemplar plans to which Saint Mary's had access were those it could find publicly available.  One exemplar PPO medical benefit summary Saint Mary's was able to locate provided coverage for out-of-network non-emergency services at (typically) 80% of the "usual and customary" rate (some services, including telemedicine services, were covered at 100% of the usual and customary rate).[7]  The plan summary covers emergency services at the usual and customary rate, specifying that "[i]f a covered person requires care for a Medical Emergency as defined below and is transported by an ambulance or private transportation to a Non-PPO facility, such Non-PPO fees will be subject to Usual and Customary instead of the PPO negotiated rate(s)."[8]  The terms determinable from this summary plan description are offered for

---

[4] *Id.* at HTH000127.
[5] *Id.* at HTH000128.
[6] Three out of the Four Benefit Plans define the usual and customary rate in terms that suggest it is determined by charges of exemplar providers in the relevant market.  *See id.*
[7] *See* **Exhibit C**.  This particular benefit summary, however, appears to relate to a 2021 plan and therefore is not applicable to any particular claim at issue in this case, as explained in the paragraphs above.
[8] *See* **Exhibit C**.

4892-2091-3159

the purposes of further establishing that many plans at issue in this case, which cover claims from 2014 to 2019, likely also provide coverage at the usual and customary or other market rate, or some proportion thereof.  A copy of this plan summary is attached as Exhibit C to this 1AC.

32.    The summary in Exhibit C does not contain a definition of "usual and customary" or "usual, customary, and reasonable" (a phrase the summary also uses).  However, Saint Mary's was also able to secure a copy of an exemplar individual plan from Hometown Health's website (for year 2021) which contains the following definition of "usual and customary:"

> The lesser of:
>
> A Provider's usual charge for furnishing a treatment, service, or supply; or
>
> The amount Hometown Health determines to be the general rate paid to others who render or furnish such treatment, service, or supply to individuals who reside in the same geographic area and whose conditions are comparable in nature and severity.[9]

33.    This is a common formula for determining usual and customary charges among insurers in Saint Mary's experience, and it is reasonable to infer that many plans at issue in this case (1) apply a "usual and customary" or other market-based rate-determining mechanism in deciding how to pay out-of-network providers, and (2) define "usual and customary" in a way similar to the above.

34.    The plans HH has produced provide similar definitions. Though they provide distinct definitions for "usual and customary," they incorporate the relevant geographical market in determining the rate.  For example, one plan provides that:

_____

[9] *See* **Exhibit D**.

4892-2091-3159

.[10]

35.     Other plans use the phrase "Usual, Customary, and Reasonable," and provide the following definition:

.[11]

36.     This definition also incorporates the concept of market rates in the relevant geography.  Notably, the Non-PPO rate defaults to "PPO negotiated rates" but (paradoxically) PPO negotiated rates are not paid where that would exceed the "non-PPO" Usual, Customary, and Reasonable allowance.  PPO negotiated rates differ from provider to provider, so there is no one PPO negotiated rate that could stand in for a UCR determination with respect to services provided by Saint Mary's, an out-of-network provider.

37.     Thus, based on the available plan documents and Saint Mary's experience with HH generally, the insurance plans relating to the remaining Claims at issue in this matter almost certainly contain similar coverage language, requiring coverage of medically necessary out-of-network services at the "usual and customary" or "reasonable and customary" or "market" rate, or at a proportional rate based on that rate, and covering emergency services at even more favorable rates.

---

[10] Exhibit B at HTH000128.
[11] Exhibit B at HTH000297.

4892-2091-3159

38.    Per the Four Benefit Plans produced by HH and the only publicly available examples, Saint Mary's has identified (a) coverage for the services provided by Saint Mary's, (b) plan terms conferring specific reimbursement benefits to Saint Mary's; thus demonstrating that HH deprived Saint Mary's of the full benefits it was owed.  All of the applicable rate standards specifically identified above are based on what the services provided normally command in the market.  Based on single case agreements between the parties, Saint Mary's experience with other insurers, and Saint Mary's knowledge and experience in the industry, HH underpaid the Claims.  Even excluding all cases in which HH paid nothing, the average payment percentage relative to Saint Mary's billed charges for the Claims at issue is a pitiful 20.42%.

### *Denied and Underpaid Non-Emergency Claims*

39.    HH denied numerous Claims for service in this case, under a variety of pretexts, including alleging that the claims were not timely filed (when they were, or when the timeliness of filing was excused).  HH denied reimbursement for some services improperly because they were allegedly "post-stabilization," and HH denied reimbursement for some services because, in HH's view, the services were not proper or were medically unnecessary.

40.    Many of the Claims for services were underpaid by the terms of HH's own insurance contracts.  Where HH deigned to pay Saint Mary's at all for the Claims, HH paid an average of just over 20% of the actual billed charges.

41.    For instance, one HH insured, R.G., received an MRI, a CAT scan, and radiation therapy, totaling $46,191.43 in services, which HH reimbursed at about 8%, paying just $3,833.56; indeed, this happened to R.G. multiple times for services associated with radiation therapy, with other admissions being undercompensated at similar rates.  This repeated critical underpayment exposed R.G. to significant potential expenses from Saint Mary's.  This service was covered, and yet HH provided a vanishingly small reimbursement to the facility that took care of its insured.  HH bears contractual and statutory responsibility for this payment, not R.G., who in good faith believed her coverage was based on what her plan said and on what HH represented to her that it

4892-2091-3159

would pay.  R.G.'s plan, like other examples herein, provides that for covered out-of-network benefits, the benefit will be reimbursed at the "usual and customary" rate.[12]

### *Denied Emergency Claims*

42.    In addition to the plans' contractual requirements to cover insureds for out-of-network services, HH was explicitly required to cover medically necessary emergency services under State law or pursuant to the Affordable Care Act (or both) under all of the plans at issue in this case.  NEV. REV. STAT. ANN. § 695G.170 (West).

43.    Under the Affordable Care Act and the implementing regulations, HH must cover "emergency services" provided by out-of-network providers in a manner consistent with the coverage provided for in-network providers. 29 C.F.R. § 2590.715-2719A.  Coverage for such services must be the greatest of the following three amounts: (1) "the amount negotiated with in-network providers for the emergency service furnished, excluding any in-network copayment or coinsurance imposed with respect to the participate or beneficiary;" (2) "the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount), excluding any in-network copayment or coinsurance imposed with respect to the participant or beneficiary;" or (3) "The amount that would be paid under Medicare (part A or part B of title XVIII of the Social Security Act, 42 U.S.C. 1395 et seq.) for the emergency service, excluding any in-network copayment or coinsurance imposed with respect to the participant or beneficiary."  29 C.F.R. § 2590.715-2719A(b)(3)(i).

44.    Under Nevada State Law, coverage for emergency care is required regardless of whether the Hospital is in- or out-of-network.  "Medically necessary emergency services" are defined as:

> …health care services that are provided to an insured by a provider of health care after the sudden onset of a medical condition that manifests itself by symptoms of such sufficient severity that a prudent person would believe that the absence of immediate medical attention could result in:
>
> (a) Serious jeopardy to the health of an insured;
> (b) Serious jeopardy to the health of an unborn child;

---

[12] *See* Exhibit B at HTH000127-28.

(c) Serious impairment of a bodily function; or

(d) Serious dysfunction of any bodily organ or part.

45.     Therefore, each and every time HH denied coverage for emergency services for one of its insureds, it violated the law (either state law, federal law, or both) and its own insurance contracts.

46.     Saint Mary's is entitled to payment for these services for at least four independent reasons:

   a. First, because these denials violated the relevant insurance agreements, the benefits of which have been assigned to Saint Mary's.

   b. Second, because even if the relevant insurance plans were construed as not requiring coverage of these emergency services by their express terms, pursuant to Nevada law, "a health care plan subject to the provisions of this section that is delivered, issued for delivery, or renewed on or after October 1, 1999, has the legal effect of including the coverage required by this section, and any provision of the plan or renewal which is in conflict with this section is void." NEV. REV. STAT. ANN. § 695G.170 (West).  All plans relating to all the Claims in this case were issued or renewed after October 1, 1999, and all Claims in this case are governed by this statute.  As the successor to all contract rights of the insureds relating to the Claims, Saint Mary's is entitled to assert claims for coverage of these denied emergency services as contract claims.

   c. Third, because the Nevada Emergency Care Statutes provide a right of private action on the part of the health care provider.  And,

   d. Fourth, because for any of those group plans that cover emergency services *at all*, the Affordable Care Act requires that they cover emergency services provided by out-of-network hospitals whether or not the contract or state law provides for same, and this right may be pursued either in contract or through ERISA.

16

*__Underpaid Emergency Claims__*

47.    HH also underpaid many emergency care claims for services, in contravention of both HH's own contracts, Nevada law, and the Affordable Care Act.

48.    First, the relevant insurance documents require compensation at the usual and customary rate, or at a similar market rate, for the services Saint Mary's provided.  By paying *at all*, HH conceded that these claims were properly payable, but they have not paid the amounts due under law for the services Saint Mary's provided.

49.    Second, the Nevada Emergency Care Statutes require payment at more than the *de minimus* amount than was provided by HH.

50.    Third, the Affordable Care Act, as explained above, requires that HH be compensated at the *greatest of* HH's (median) in-network rate, the usual and customary out-of-network rate, or the Medicare rate for emergency services.  29 C.F.R. § 2590.715-2719A(b)(3)(i).

51.    HH underpayments were far below the amounts required by the contracts, Nevada law, or the Affordable Care Act.

52.    For example, one HH insured, A.W., was a severely premature newborn who received a great deal of necessary (and emergent) care associated with her delivery, including a significant stay in the Neonatal Intensive Care Unit, cardiology services, chemistry and hematology tests, respiratory services, and constant monitoring. This baby was extremely ill, and required a long hospital stay—over twenty days. Even at the time of transfer—which was required for insurance purposes, demonstrating that Saint Mary's was aware of, and respectful of, HH's network—A.W. still needed an ambulance transfer, because she required IV maintenance, cardiac or other physiological monitoring, and was ventilator dependent. The charges incurred were $324,507.92. Of this amount, HH paid only $36,907.68—only 11% of the reasonably incurred billed charges.

53.    The applicable plan related to the above claim provided that

,"[13]

54.    The attendant summary of benefits confirms this, noting that

."[14]

55.    The applicable plan further provides,

."[15]

56.    The services were covered.  They were critical, and necessary for the preservation of this infant's life.  Saint Mary's provided such services and tendered a claim to HH.  The 11% reimbursement Saint Mary's received was far lower than the usual and customary rate that HH by law and its plan was required to pay.

57.    Another example is patient D.M., for whom the reasonable billed charges for the complicated services the patient required for stabilization amounted to $78,369.10.  D.M. received critical emergency services in order to stabilize him to enable transport to another facility that could repair an aortic dissection.  HH paid a tiny fraction (about 3%) of this amount, only $2,296.78.  Insurance covered these services, D.M. received these services, and HH paid essentially none of the costs its insured incurred, potentially exposing D.M. to tens of thousands of dollars of uncovered charges.  Rather than further victimize HH's insured, however, Saint Mary's seeks to exercise its assignment of benefits from D.M. and pursue this underpayment from HH—who should have appropriately paid Saint Mary's in the first place.

---

[13] Exhibit B at HTH000114.
[14] *Id.*
[15] *Id.* at HTH000045.

18

4892-2091-3159

58.     The applicable plan required payment at the usual, customary, and reasonable rate, and 3% of the charges for these medically necessary and life-saving stabilizing services cannot constitute the                                                                      .[16]

59.     In another claim, involving patient P.M., the reasonable billed charges for the service provided were $148,644.79.  HH decided these services were covered and paid the claim—but only in the amount of $15,865.31 or about 10.7% of the value of the services P.M. required and received, which included significant emergency medical interventions including multiple diagnostics and an angioplasty.  Again, Saint Mary's seeks payment for this service from HH, the party responsible for paying it, rather than from HH's insured, who reasonably believed the full amount was covered and is not responsible for his insurer's payment of only a tiny fraction of the value of the services he needed.

### _Violations of ERISA or Duties Arising Thereunder_

60.     For each and every underpayment or improper denial alleged herein that arises under an ERISA plan, HH has violated ERISA; specifically, HH has violated HH's duty to HH's insureds by not paying claims which were covered, and by underpaying claims which were covered at a higher level than HH paid.  An ERISA beneficiary has a cause of action under ERISA to recover wrongfully denied benefits.  29 U.S.C. § 1132(a)(1)(B).  Pursuant to the Assignments of Benefits each insured signed, Saint Mary's stands in the shoes of those insureds.  Saint Mary's is entitled to the amounts that would have been paid had these claims been properly accepted and paid.

### _Non-Assignment_

61.     Though it is HH's burden to plead and prove any binding anti-assignment language in relevant plan documents, Saint Mary's anticipates that HH will point to anti-assignment language contained in the Four Benefit Plans.  However, the now-available plan documents make

---

[16] _Id._ at HTH000234, 240.

19

clear that at least some of HH's plans explicitly permit and contemplate assignment of benefits to providers.

62.     Alternatively, for the plans that contain anti-assignment provisions, HH has waived those provisions.

63.     As part of Saint Mary's communications with HH concerning requested payment, Saint Mary's has at all relevant times, including but not limited to all times since January 2014, provided HH with notice that Saint Mary's is the assignee of the patients for which it seeks assigned rights under the plans administered by HH.

64.     HH has made payments to Saint Mary's under those plans insuring those patients pursuant to the assignments, without raising any issue related to whether applicable plans contain any purported "anti-assignment" provision.

65.     Moreover, the versions of anti-assignment clauses in the available plans that contain them are too vague to be applied against providers as a matter of law.

66.     To the extent HH will again seek to dismiss any claims in this matter on the basis of anti-assignment language, it has waived any such right and is estopped from raising such a defense, and in any case could not establish at the pleading stage that such a defense applies as a matter of law.

### *Appeals and Exhaustion*

67.     Saint Mary's has complied with all relevant appeals provisions under the relevant benefit plans, or was excused from performing same due to a prior breach of the patient's insurance contract by HH, or because any such appeal would have been futile.

68.     On multiple occasions, Saint Mary's sent HH appeals letters regarding the unpaid or underpaid claims.  Saint Mary's efforts did not result in any payment from HH, or in most cases, even a final decision on Saint Mary's claims.

69.     Saint Mary's also was not able to appeal the claims where HH merely held Saint Mary's claims submissions in limbo without allowing or denying the claims.

70.     Saint Mary's has exhausted all remedies required under applicable law prior to this litigation, or was excused from so doing.

4892-2091-3159

## CAUSES OF ACTION

**Count 1 – Failure to Comply with Health Benefit Plans in Violation of ERISA**

*Applies to Claims Arising From ERISA Plans*

71.    Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

72.    Saint Mary's is entitled to enforce the terms of the health insurance plans, as assignee of patients/members under 29 U.S.C. § 1332(a)(1)(B), for whom HH has made claims determinations without following the applicable plan language and in an arbitrary fashion, and to obtain appropriate relief under such provision.   Under § 502(a) of ERISA, Saint Mary's (as beneficiary and assignee) is entitled to recover benefits due to it and/or the patients from whom Saint Mary's received Assignments of Benefits, under the terms of the plans between the patients and HH.

73.    Saint Mary's provided emergency services to the HH members at issue that are covered at the usual and customary rate under the terms of their respective benefit plans.  However, HH failed to adjudicate and pay those claims in accordance with those agreements.  As explained above, the majority of those benefit plans required HH to reimburse an out-of-network emergency service provider such as Saint Mary's at the usual and customary rate, but HH did not do so. Further, a number of those benefit plans also required HH to reimburse an out-of-network provider for elective services at the usual and customary or comparable market rate, but HH did not do so. Instead, HH paid Saint Mary's amounts that were well below the usual and customary rate in the relevant geographic area.

74.    This not only violated the terms of the plans themselves, but for those claims involving the provision of emergency services, it also violated the Affordable Care Act, which required reimbursements to be made at the highest of HH's in-network rate, the usual and customary out-of-network rate, or the Medicare rate.  29 C.F.R. § 2590.715-2719A(b)(3)(i). ERISA incorporates these requirements of the Affordable Care Act with respect to group health plans.  29 U.S.C. § 1185d.  Thus Saint Mary's has the right to recover these underpaid benefits under ERISA section 502(a)(1)(B) as well.

4892-2091-3159

75.    For the denied claims, as described above, HH breached the terms of those patients' health insurance plans by failing to pay Saint Mary's for the medically necessary services that Saint Mary's provided to HH insureds. Those services were covered under the terms of the patients' health insurance plans, and Saint Mary's should have been paid for providing them. HH's failure to pay Saint Mary's for these services has resulted in damages to Saint Mary's equal to the amount payable for those services under the terms of those patients' health insurance plans.

76.    HH breached the terms of the plans by making claims determinations that had no basis in the plan terms, without valid evidence or information to substantiate such determinations and departures from the terms of the applicable plans, and/or in an arbitrary fashion.

77.    As a proximate result of HH's wrongful acts, Saint Mary's has been damaged in an amount in excess of the jurisdictional limits of this Court. Saint Mary's seeks to recover all unpaid and underpaid benefits that are owed to it under the terms of the patient benefit plans for providing covered emergency services to HH's members.

### Count 2 – Breach of Contract

#### *Applies to All Claims*

78.    Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

79.    HH's insurance plans provide for payment of emergency and elective services at the usual and customary rate, including to out-of-network providers such as Saint Mary's. Further, a number of those benefit plans also required HH to reimburse an out-of-network provider for elective services at the usual and customary or comparable market rate. Each of the HH insureds for whom Saint Mary's provided services validly assigned his or her health insurance plan benefits to Saint Mary's as part of their conditions of admission paperwork. Thus, Saint Mary's stands in the insured's shoes and has standing to assert all rights that HH owes to each insured under his or her health insurance plan.

80.    Despite agreeing in the health insurance plans it issues to cover care by out-of-network providers at the usual and customary rate, HH has failed to fulfill those obligations. Saint Mary's is entitled to recover the difference between the amount HH paid, if anything, for

emergency care that Saint Mary's provided to HH's insureds and the usual and customary rate, as well as its costs and attorneys' fees.

81.    Moreover, for the denied claims pleaded above, HH breached the terms of those patients' health insurance plans by failing to pay Saint Mary's for the medically necessary services that Saint Mary's provided to HH's insureds.  Those services were covered under the terms of the patients' health insurance plans, and Saint Mary's should have been paid for providing them.  HH's failure to pay Saint Mary's for these services has resulted in damages to Saint Mary's equal to the amount payable for those services under the terms of those patients' health insurance plans.

### Count 3 – Contract Implied-in-Law (In the Alternative)

#### *Applies to All Claims*

82.    Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

83.    Federal and state laws support an implied-in-law contract whereby Saint Mary's was legally required to provide services and care to the members that arose through the emergency room, upon which HH became legally required to pay Saint Mary's directly for such services rendered to HH's members.

84.    Under the federal Emergency Medicaid Treatment and Active Labor Act ("EMTALA") and Social Security Act § 1867(a), Saint Mary's is required to provide emergency services and care to all individuals, including members of HH, who present themselves at its emergency department with potentially life-threatening conditions, without regard to the patients' ability to pay or their possession of insurance benefits.  Likewise, NEV. REV. STAT. ANN. § 439B.410 requires hospitals to provide emergency services regardless of the financial status of the patient.  Furthermore, discharging emergency room patients immediately after their condition has stabilized when they are still in need of further inpatient medical care would cause further imminent harm, and HH has an obligation to its members to provide access to post-stabilization medical services, and to reimburse medical providers for the costs of such services.

4892-2091-3159

85.     At all material times, HH knew that out-of-network providers such as Saint Mary's provide emergency medical care to HH's insureds. Indeed, HH's own health plans contemplate reimbursement to out-of-network providers for such emergency medical services.

86.     The common law also imposes an implied-in-law contract to pay for the services that a defendant has indicated through words or deeds that defendant would pay for.  Based on the verifications, authorizations, and representations obtained from HH regarding each of the patients, HH bears financial responsibility to pay for the services that Saint Mary's rendered to the patients at issue.  Through such industry standard verifications, authorizations, and representations provided by HH in the ordinary course of business, HH represented to Saint Mary's that the services at issue would be paid for by HH.  Moreover, HH demonstrated its acknowledgement of a duty to pay for the majority of the services by paying or causing payment of something on them.

87.     Through the above-described course of conduct, HH and Saint Mary's have demonstrated their mutual agreement and understanding that HH will reimburse Saint Mary's at the usual and customary rate for any emergency services rendered to HH members, and that Saint Mary's will accept reimbursement at the usual and customary rate as payment in full for the provision of such emergency services.  Accordingly, the parties have formed an enforceable, implied-in-fact contract.

88.     However, after Saint Mary's rendered emergency medical services to HH's members, HH paid to Saint Mary's amounts significantly less than the usual and customary rates for the services rendered, or nothing at all.

89.     HH's failure to reimburse Saint Mary's at a usual and customary rate constitutes a breach of the parties' implied-in-fact contract.

90.     Consequently, Saint Mary's seeks damages for the breach, in the amount of the difference between the usual and customary rates and the amounts HH has paid, if anything, for emergency services that Saint Mary's rendered to HH's members.

4892-2091-3159

## Count 4 – Unjust Enrichment/Quantum Meruit (In the Alternative)

### *Applies to All Claims*

91.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

92.     Saint Mary's rendered valuable emergency services to HH's members.  For the patients who received post-stabilization services from Saint Mary's, HH either authorized the services explicitly, and/or authorized them implicitly by not arranging for transfer to another hospital, and thus, is deemed to have authorized the services.  Furthermore, for the non-emergency claims, HH either authorized Saint Mary's to provide (following requests by Saint Mary's) authorization, or told Saint Mary's that no authorization was needed for Saint Mary's to provide the non-emergency services.

93.     HH received the benefit of having its healthcare obligations to its plan members discharged and its members received the benefit of the medical care provided to them by Saint Mary's.

94.     As an insurer, HH was reasonably aware that medical service providers, including Saint Mary's, would expect to be paid by HH for the emergency services provided to its members. Indeed, as pled, this obligation is codified in the Nevada Insurance Code and accompanying regulations and was impliedly agreed to by the parties.  HH has an obligation to its members to provide access to medical services and to reimburse medical providers for the cost of those services.

95.      HH accepted the benefit of the services provided by Saint Mary's to members of its health plan (and certainly accepted the premiums paid by those members).  However, HH has arbitrarily and unilaterally reimbursed Saint Mary's at amounts far lower than the value of the services provided by Saint Mary's and lower than the rates it is obligated to pay under its members' individual coverage plans.  Moreover, HH has also denied other claims and wholly failed to reimburse Saint Mary's for the services it provided to HH's members.

96.      HH misappropriated the benefits from the services performed by Saint Mary's to HH's members, the value of which HH has retained by failing to pay for the reasonable value of such services, and the retention of which would be inequitable.

97.     Therefore, Saint Mary's is entitled to *quantum meruit* recovery.

98.     As a result of HH's actions, Saint Mary's has been damaged and is entitled to recover the difference between the amount HH paid, if anything, for the emergency care Saint Mary's rendered to HH's members and the reasonable value of the services that Saint Mary's rendered to HH by discharging its obligations to HH's plan members.

### Count 5 – Violation of Nevada Emergency Care Statutes[17]

### *Applies to Emergency Claims*

99.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

100.     HH is an "Insurer" under the Nevada Insurance Code.  Nev. Rev. Stat. Ann. § 679A.100.  Saint Mary's is an out-of-network provider who has provided emergency care to HH's members.

101.     Section 695G.170 of the Nevada Insurance Code requires HH to "provide coverage for medically necessary emergency services provided at any hospital" and thus to pay for emergency care provided by out-of-network providers such as Saint Mary's.  HH is required to provide such coverage of emergency care to out-of-network providers at the usual and customary rate. *See* Nev. Rev. Stat. Ann. § 439B.748.

102.     HH has failed to fulfill its obligations under the Nevada Insurance Code by failing to pay for emergency care at the usual and customary rate on the claims submitted by Saint Mary's for emergency care rendered to HH's members.  Saint Mary's damages are beyond what any ERISA plan would have covered due to HH's administration.

103.     Saint Mary's is entitled to recover the difference between the usual and customary rate and the amount HH has paid, if anything, for the emergency services that Saint Mary's rendered to HH's members.

---

[17] The "Nevada Emergency Care Statutes" referenced herein include sections 679A.100 and 695G.170 of the Nevada Insurance Code and section 439B.748 of the Nevada Revised Statutes.

4892-2091-3159

**Count 6 – Violation of the Nevada Prompt Payment Statutes**

***Applies to All Claims***

104.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein.

105.     The Nevada Insurance Code requires an insurer to pay a health care provider's claim within 30 days of receipt of an electronically submitted clean claim.  NEV. REV. STAT. ANN. § 683A.0879.

106.     Despite this obligation, HH has taken far longer than 30 days to adjudicate and pay Saint Mary's clean claims, even when it underpaid those claims.  Indeed, HH's delays in processing and paying Saint Mary's claims have increased over time, and a number of claims are currently pending with HH that Saint Mary's filed more than 30 days ago.  Saint Mary's has even noticed HH of its delay in processing HH's claims, but to no avail.

107.     For all claims payable by plans that it insures that HH failed to pay within 30 days, HH is liable to Saint Mary's for interest.  NEV. REV. STAT. ANN. § 683A.0879.  Saint Mary's seeks interest payable to it for late-paid claims under these statutes.

**CONDITIONS PRECEDENT**

108.     All conditions precedent have been performed or have occurred.

**ATTORNEYS' FEES**

109.     Saint Mary's re-alleges and restates the preceding paragraphs as if they were fully set forth herein and further incorporates the allegations of 80 to 83 in all of the general allegations and all of the specific claims herein.

110.     Saint Mary's has been required to retain counsel to pursue its claims in this litigation.

111.     Pursuant to 29 U.S.C. § 1332(g), NEV. REV. STAT. ANN. § 18.010, and Fed. R. Civ. P. 54(c), Saint Mary's is entitled to an award of attorneys' fees.

**JURY DEMAND**

112.     Saint Mary's hereby demands a trial by jury of the above-styled action for all claims for which a jury is available.

4892-2091-3159

### CONCLUSION

Plaintiff Prime Healthcare Services – Reno, LLC d/b/a Saint Mary's Regional Medical Center hereby requests that HH be cited to appear and answer this 1AC and that upon final trial and determination thereof, judgment be entered in favor of Plaintiff awarding Plaintiff the following relief:

A. Monetary damages equaling the difference between the amount HH already paid, if anything, on the health care claims at issue and the usual and customary rate;

B. An award of interest pursuant to NEV. REV. STAT. ANN. § 683A.0879;

C. Quantum meruit recovery;

D. Reasonable attorneys' fees;

E. Court costs;

F. Pre-judgment and post-judgment interest; and

G. Such other and further relief to which the Plaintiff may be entitled.


Dated: December 20, 2021                          SNELL & WILMER L.L.P.


By: */s/ Janine C. Prupas*
William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
50 West Liberty Street, Suite 510
Reno, Nevada  89501

*Attorneys for Plaintiff*

28

4892-2091-3159

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed **PLAINTIFF'S FIRST AMENDED COMPLAINT** with the Clerk of the Court for the U.S. District, District of Nevada by using the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED this 20th day of December 2021

*/s/ Lyndsey Luxford*
An employee of SNELL & WILMER L.L.P.