William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
SNELL & WILMER L.L.P.
50 West Liberty Street, Suite 510
Reno, Nevada 89501
Telephone: (775) 785-5440
FAX: (775) 785-5441
wpeterson@swlaw.com
jprupas@swlaw.com

Jennifer R. Ecklund
Mackenzie S. Wallace
John P. Atkins
THOMPSON COBURN LLP
Admitted Pro Hac Vice
2100 Ross Ave., Suite 600
Dallas, TX 75201
Telephone: (972) 629-7100
FAX: (972) 629-7171
jecklund@thompsoncoburn.com
mwallace@thompsoncoburn.com
jatkins@thompsoncoburn.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| PRIME HEALTHCARE SERVICES – RENO, LLC D/B/A SAINT MARY'S REGIONAL MEDICAL CENTER,<br><br>     Plaintiff,<br><br>     vs.<br><br>HOMETOWN HEALTH PROVIDERS INSURANCE COMPANY, INC. AND HOMETOWN HEALTH PLAN, INC.,<br><br>     Defendants. | Case No. 3:21-cv-00226-MMD-CLB<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>. |

## I.   SUMMARY OF ARGUMENT

HH[1] boldly tells the Court: "The single, simple answer is yes," an insurer can legally refuse to pay a medical provider (or pay whatever pittance it wishes) for medically necessary services provided to its insureds in good faith by a hospital simply because that hospital is not in its provider network. But Nevada law and HH's own benefit plans disagree. And just days ago, the Ninth Circuit likewise disagreed, rejecting another insurer's attempt to avoid payment of an out-of-network provider's necessary care, and formally invalidating HH's position here. *See Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, No. 20-56122, 2022 WL 129139 (9th Cir. Jan. 14, 2022). The Ninth Circuit opined that if the assignee lacked standing to sue the insurer, the result would "undermine the goal of ERISA," "force healthcare providers into...bankruptcy," and "require patients to foot the entire bill up front (which many would be unable to do)." *Id*. at *4. But HH reinforces why patients and providers become furious with health insurance companies who prefer to deny, delay, and defend in court, rather than paying for medically necessary care as their contracts require. Further, HH fails to distinguish between the separate theories alleged by Saint Mary's: that (1) ERISA and contract law, through Saint Mary's assignments and HH's own policies; (2) the Nevada Emergency Care Statutes; and/or (3) Quantum Meruit all require HH to reimburse Saint Mary's at the usual and customary rate. These distinct, valid avenues of recourse necessitate discovery because the applicable legal theories depend upon the type of claim at issue. The Court should deny HH's Motion to Dismiss Saint Mary's First Amended Complaint (the "Motion") in its entirety.

**Saint Mary's has standing to sue HH,** because (a) Saint Mary's sufficiently pleaded valid assignments; (b) binding precedent supports that HH's failure to pay Saint Mary's at the rate required by the relevant plan documents constitutes an injury-in-fact; (c) HH's purported anti-assignment clauses do not bar assignment to providers and Saint Mary's sufficient pleading triggers discovery; (d) HH waived its anti-assignment defense by issuing partial payment on Saint Mary's claims; and (e) HH's anti-assignment clauses violate Nevada law.

---

[1] Defendants Hometown Health Providers Insurance Company, Inc. and Hometown Health Plan, Inc. will be referred to herein collectively as "HH."

***ERISA does not preempt Saint Mary's state and common law claims***, because the Emergency Care Statutes and the Nevada Prompt Pay Statutes directly affect the risk pooling arrangement and are thus saved from preemption.  Likewise, ERISA also does not completely preempt Saint Mary's Quantum Meruit claim because the Emergency Care Statutes provide an independent legal basis for that claim.  Moreover, any determination on ERISA preemption is premature because HH has refused to provide information that would have allowed Saint Mary's to identify which of the 690 claims involve non-ERISA and fully-funded plans.

***Saint Mary's Complaint sufficiently pleaded each cause of action***.  Saint Mary's Complaint incorporates the Claims List setting out individually 690 claims HH failed to properly pay, and specifically alleging the basis for its liability to Saint Mary's; the Nevada Legislature intended that a healthcare provider not paid as the Emergency Care Statutes require should have the right to payment at the usual and customary rate; Saint Mary's is entitled to assert a claim for Quantum Meruit against HH because Saint Mary's conferred a direct benefit to HH; and the Nevada Insurance Code entitles the Hospital to recover prompt pay penalties.

***Saint Mary's was not required to plead exhaustion***, because Saint Mary's right to reimbursement is not conditioned on compliance with any appeals process, and because failure to exhaust administrative remedies is HH's affirmative defense, not Saint Mary's burden to plead.

## II.      STATEMENT OF FACTS

Saint Mary's, an award-winning acute care hospital, provides critical health care services to residents of Reno, Nevada, and the surrounding area.  1AC ¶ 8.  As a non-participating (or "out-of-network" (OON)) provider, Saint Mary's has no agreement with HH to accept any particular, specified rates as payment-in-full for providing care to HH's members.  1AC ¶ 9. Saint Mary's treats HH members, as it is ethically and legally required to, including by providing emergency and other care.  Patients in need of emergency care often present to the nearest hospital, regardless of network status.  Saint Mary's secures assignments of insurance benefits from all patients, which explicitly mention ERISA benefits.  1AC ¶ 21.  Where no written agreement (network contract) exists, the patients' health insurance plans or the Nevada Insurance Code specify the level of payment that HH is required to pay Saint Mary's for providing

emergency services to its members.  The Four Benefit Plans that HH produced (as required by this Court) confirm that HH's insurance plans require coverage of medically necessary out-of-network services at the "usual and customary rate" or at a rate derived therefrom.  1AC ¶¶ 28-30, 34-38, 53-54, 58.

Saint Mary's provided medically necessary services to patients insured under plans that were underwritten or administered by HH.  1AC ¶ 11.a.  Thereafter, HH underpaid or improperly denied payment for 690 claims.  1AC ¶¶ 11.b, 14.  Through multiple attempts to obtain information from HH regarding which of the claims related to fully-funded or self-funded ERISA plans or non-ERISA plans, HH has refused to provide it.  1AC ¶ 17.  While Saint Mary's cannot determine which of the 690 claims are subject to ERISA or non-ERISA plans, Saint Mary's can demonstrate that HH denied all reimbursement on 128 claims.  1AC ¶ 18.  The remaining 562 claims were underpaid.  *See* 1AC ¶ 18.  At present, the total amounts due for claims for services that were denied and underpaid is $6,001,530.51.  1AC ¶ 20.

Saint Mary's has been assigned the right to direct payment and to benefits flowing from the relevant plans for the HH members it treated.  1AC ¶ 21-22.  Moreover, Saint Mary's exhausted all contractually required appeals procedures on behalf of the members or was excused from doing so either due to a prior breach by HH, or because appeals have proved futile in previous dealings with HH.  1AC ¶ 24.  The comprehensive list and itemization of the full 690 claims (the "Claims List") is incorporated into the 1AC and filed under seal as Exhibit A of the 1AC to protect patient confidentiality.  1AC ¶ 15.

### III.   LEGAL STANDARD

A complaint need only be a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to provide a defendant with fair notice of the claim and the grounds upon which it stands.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); FED. R. CIV. P. 8(a)(2).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged."  *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a Rule 12(b)(6) motion, the court must "take all allegations of material fact as true and construe them in the light most favorable

to the nonmoving party." *Park School of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal "is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests." *Bank of Am., N.A. v. Mesa Homeowners' Ass'n*, 446 F. Supp. 3d 692, 696 (D. Nev. 2020). Moreover, "dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) ("dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment."). Although Saint Mary's contends HH's Motion to Dismiss should be denied in its entirety, Saint Mary's alternatively requests leave to replead.

## IV.   ARGUMENT

### A.   Saint Mary's has standing to assert ERISA and Breach of Contract causes of action.

HH argues that Saint Mary's lacks derivative standing because Saint Mary's assignments do not assign the right to sue, because HH's own policies forbid assignment, and because no party suffered an injury-in-fact.[2] Each of HH's arguments fail because, at bottom, Saint Mary's pleaded valid assignments and the evidentiary questions regarding sufficiency of assignments necessarily raise fact issues to be resolved through discovery.

#### 1.   Saint Mary's pleaded valid assignments.

*First*, Saint Mary's adequately pleaded the existence of valid assignment by (a) citing to specific language from the assignment, and (b) pleading sufficient facts to support that Saint Mary's obtained assignments for the claims at issue.[3] *See* 1AC ¶ 21. Saint Mary's cites to specific language from an applicable assignment in its 1AC.[4] Saint Mary's is not required to

---

[2] HH incorrectly argues that Saint Mary's has no direct standing for any claims and that its state law claims would only arise from the assignment of the individual contractual rights and thus also fail for lack of standing (*see* Motion at FN 3), but as addressed below, Saint Mary's pleads claims directly as the injured party under the Nevada Emergency Care Statutes and Quantum Meruit that do not rely on the standing and assignment from its patients.

[3] HH misrepresents that Saint Mary's "fails to allege the specific language from even one of the purported assignments" where in fact, Saint Mary's cited to the assignment at 1AC ¶ 21.

[4] *See* 1AC at ¶ 21 ("...the undersigned irrevocably assigns and hereby authorizes...direct payment to the hospital...all private and public insurance benefits otherwise payable to or on behalf of the patient for this hospitalization or for these outpatient services and for any emergency services, if rendered, including but not limited to group/medical/indemnity/self-insured ERISA benefits/coverage, PIP, UIM/UM, as well as auto-homeowner insurance.").

attach assignment documents to its 1AC.  Rule 8 only requires Saint Mary's to plead a sufficient factual basis that the assignment was plausible.  *See In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcar*e, SACV 19-2075 JVS (DFMx), 2020 WL 8457488, at *4 (C.D. Cal. Nov. 18, 2020) ("requiring that the complaint include the text of the assignment contravenes [Rule] 8....Therefore, the Court does not dismiss Plaintiffs' ERISA claim merely for failure to quote the exact language of the assignment.").  Saint Mary's pleaded that its practice was to obtain an assignment for each of its patients, and that for each patient, the assignment included either the exact language of the quoted assignment or language that had a similar legal effect.  *See* 1AC ¶ 21.  Saint Mary's assignments assign "direct payment" to Saint Mary's for all insurance benefits, including ERISA benefits specifically, and include all material terms.  The assignments as pleaded are valid and sufficient to confer standing on Saint Mary's for this suit.

Moreover, Rule 8 does not require Saint Mary's to attach the assignments for each of the 690 claims to state a claim for relief.  *See, e.g.*, *Tran Chiropractic Wellness Ctr. Inc. v. Aetna*, 8:20-CV-00269-DOC-(JDEx), 2015 WL 144243, at *4 (M.D. Fla. Jan. 12, 2015) (to defeat dismissal, it is sufficient for plaintiffs to allege "that they have assignments from all of the patients at issue...Rule 8 does not require Plaintiffs to attach those hundreds of assignments to their complaint.").  HH's own authority forecloses its arguments.  *TML Recovery* found standing to sue where the plaintiffs quoted the text of just *one* patient's assignment of benefits out of 508 claims at issue.  *TML Recovery, LLC v. Cigna Corp.*, 8:20-CV-00269-DOC-(JDEx), 2021 WL 3730168, at *3 (C.D. Cal. July 26, 2021).  Even more, *TML Recovery* rejected HH's argument that the 1AC should be dismissed for "mass-pleading" for failure to include sufficient details for each of the claims at issue.  *See id.* at *3-4 (consolidating 508 out-of-network patient claims "into one lawsuit for purposes of judicial economy," and rejecting the insurer's argument to dismiss plaintiffs' complaint on the ground it was "mass-pled" because "[r]equiring Plaintiffs to plead details for all 508 Patients' plans would undermine this goal [of judicial economy] and be deeply unfair to Plaintiffs.").  Rule 8 does not require any further specificity than what Saint Mary's provided, and this Court should not allow HH to misconstrue pleading standards to continue evading payment on 690 claims.

*Second*, the assignment pleaded by Saint Mary's validly assigns the right to sue. As HH recognizes, it is well established in the Ninth Circuit that a healthcare provider may obtain derivative standing to enforce a beneficiary's claim by virtue of a valid assignment. *See*, *e.g.*, *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289 (9th Cir. 2014). It is similarly well-established that an assignment of benefits is enough to confer a right to sue to recover those benefits; after all, the right to receive benefits would be hollow without such enforcement capabilities. *See id.* HH plays a misleading game by trying to distinguish "assignment of the right to receive payment" and an assignment of the right to sue to recover the same payment. Such a distinction is ignored in a case cited by HH: an assignment's right to recover payment of benefits is precisely what confers standing to sue, regardless of whether the assignment explicitly mentions the right to sue for those benefits. *See Spinedex*, 770 F.3d at 1292. In *Spinedex*, the Ninth Circuit found language in an assignment far less detailed than Saint Mary's to assign the right to sue for payment of benefits. *Id.* (interpreting the assignment's "right to seek payment of claims" which specifically assigned "BENEFITS UNDER THIS POLICY" to mean "…***rights to bring suit for payment of benefits***" while failing to assign fiduciary duty claims). The language in the assignment at issue in *Spinedex* did not specifically mention the right to sue, yet the court found it had created such a right. *Id.*

Additionally, without discussing the terms of the assignment provision at all, the Ninth Circuit just held in *Bristol SL Holdings* that a holding company (as the first assignee of an out-of-network provider) had derivative standing to sue Cigna for plan benefits because without such standing, "Cigna could force healthcare providers...into bankruptcy, thereby ensuring that [Cigna] would likely *never* have to pay for the services it authorized." 2022 WL 129139, at *4. In turn, patients would be forced to pay up front for their full medical expenses (which would be impossible for many) and then seek reimbursement from the insurer after receiving care. *Id.* Congress's purpose behind ERISA was to prevent this very situation, which is why health care providers have derivative standing to sue to recover benefits. *See id.*; *see also Misic v. Bldg. Serv. Emp.'s Health & Welfare Trust*, 789 F.2d 1374, 1377 (9th Cir. 1986) (finding assignments of benefits to medical providers prevent patients from having to front large medical bills and await

reimbursement from the plan). As a matter of public policy, insurers like HH should not be permitted to undermine ERISA's goals by preventing providers like Saint Mary's from being reimbursed while they pocket premiums intended to cover their members' care.

The assignments between Saint Mary's and its patients inherently include the ability to seek judicial enforcement of its right to direct payment of benefits under the plans. *See Bristol SL Holdings*, 2022 WL 129139, at *3 ("It is well-established that assignees are generally allowed to bring suit on behalf of the assignor...This general principle extends into the ERISA context"); *Premier Health Ctr. v. UnitedHealth Grp.*, 292 F.R.D. 204, 221 (D.N.J. 2013) (finding that out-of-network providers who have been assigned their patients' rights to reimbursement have standing to pursue ERISA claims against the insurer, and "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'"); *Tango Transp. v. Healthcare Fin. Serv., LLC*, 322 F.3d 888, 893 (5th Cir. 2003) (finding it would be "nonsensical for an original health care provider assignee to receive both [ERISA] benefits and the right to enforce them via derivative standing," but for a subsequent assignee to "receive only the benefits, but not the right to sue to enforce them").[5]

### 2. Underpayment of Saint Mary's is an injury for the purposes of standing.

HH argues that even if it underpaid Saint Mary's, the patients have not been injured because "this did not cause the patients to pay anything more," and the patients therefore have no injuries to assign. *See* Motion at 11. This argument is foreclosed by *Spinedex*, in which the Ninth Circuit reversed a district court that had erred in accepting this theory. *Spinedex*, 770 F.3d at 1288-91.[6] As the court explained, the patient's right to benefits was assigned, and as assignee,

---

[5] HH's citation to *TML Recovery*, which found the plaintiffs had standing as assignees where the assignment included language similar to Saint Mary's referencing "payment" (not the specific right to sue), does not foreclose Saint Mary's pleading of the "direct payment" assignment. *See TML Recovery*, 2021 WL 3730168, at *3 (finding standing based upon plaintiffs' assignment that "[p]laintiff has been appointed by me to act as my representative on my behalf in any proceeding that may be necessary to seek payment from Cigna"). Moreover, HH's citation to *DaVita* is misleading and inapplicable wherein *DaVita* does not address or interpret the assignment in relation to the payment of benefits but instead holds that an assignment for the payment of benefits does not include the right to sue for illegal plan terms and fiduciary claims. *See DaVita, Inc. v. Amy's Kitchen, Inc.*, 379 F. Supp. 3d 960, 968 (N.D. Cal. 2019).

[6] The Ninth Circuit is not alone here. *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) (collecting cases from the Fifth, Ninth, and Eleventh Circuits holding that the denial of plan benefits is a concrete injury for Article III standing even when patients were not directly billed for their medical services).

the provider was injured by deprivation of its right to those benefits when the insurer failed to pay. *Id.* at 1291 ("As assignee, Spinedex took from its assignors what they had *at the time of* the assignment."). The Ninth Circuit contemplated before *Spinedex* that assignments of benefits protect patients by making it "unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment," which eliminates patients' need "to pay potentially large medical bills and await compensation from the plan." *Misic*, 789 F.2d at 1377.

The now-available Four Benefit Plans attached as Exhibit B of the 1AC (hereafter referred to individually as Plans #1-4[7]) confirm that HH was required to pay Saint Mary's at the "usual and customary" rate or at a rate derived therefrom, which is more than the rates that HH actually paid Saint Mary's. *See* Plan #1 and Plan #2: ("...Hometown Health will provide...emergency services (as defined in the EOC) without requiring a prior authorization and with the same cost sharing requirement with respect to in-network and out-of-network providers and with respect to providers for which Hometown Health has no contractual relationship"[8] and "members may elect to seek services from non-preferred healthcare providers provided the member pays the additional deductible and coinsurance amounts and any additional charges over a usual and customary charge for the service provided."[9]); *see also* Plan #3 ("If a Covered Person must use the services of a Non-PPO provider in an Emergency, such expenses will be paid at the PPO benefit level" and "[t]he UCR for Non-PPO providers will be the amount that would have been allowed if the provider was a PPO..."[10]).[11]  Saint Mary's, as assignee, was injured by a denial of its assigned rights when HH underpaid or improperly denied compensation for claims it was contractually required to pay.  HH's district court citations overturn neither binding Ninth Circuit precedent, nor the requirement that HH perform according to its contracts' terms.[12]

---

[7] The plans are divided as follows, according to HH's communication to counsel for Saint Mary's: Plan #1: HTH000001–120; Plan #2: HTH000121–226; Plan #3: HTH000227–388; Plan #4: HTH000389–667.

[8] ECF No. 69, Ex. B at HTH000114, HTH000218.

[9] *Id.* at HTH000114, HTH000219.

[10] *Id.* at HTH000232, HTH000234, HTH000313.

[11] Plan #4, an HMO Medicare Advantage Plan, still requires coverage of emergency medical care but requires coverage at Medicare rates. *See id.* at HTH000413, HTH000444, HTH000446.

[12] HH's citation to *DaVita* is inapposite. The Court in *DaVita* found that the patient was not injured because the plan provisions were followed. *DaVita, Inc. v. Amy's Kitchen, Inc.*, 379 F. Supp. 3d 960, 970-71 (N.D. Cal. 2019),

### 3. HH's benefit plans do not prohibit assignment to Saint Mary's.

*First*, Saint Mary's was not required to plead any part of HH's affirmative defense that purported anti-assignment clauses in the plans prevent members from assigning their right to payment to Saint Mary's. *See Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (defense must appear on the face of the complaint to be proper for 12(b)(6) dismissal); *see also Clark v. EmCare, Inc.*, 2:16-CV-07503-ODW-JC, 2017 WL 1073342, at *2 (C.D. Cal. Mar. 21, 2017). ("A court cannot dismiss a complaint for failure to state sufficient facts going to an affirmative defense, because a plaintiff need not plead *any* facts relating to an affirmative defense.").

*Second*, it is not clear that all of plans at issue actually contain anti-assignment provisions; in fact, the Four Benefit Plans make clear that at least some of its plans explicitly permit assignment of benefits to providers.[13] This highlights the need for further discovery on the full list of 690 claims, not dismissal at the pleading stage. *See Pierce v. NovaStar Mortg., Inc.*, 422 F. Supp. 2d 1230, 1235-36 (W.D. Wash. 2006) (finding questions appropriately resolved in a summary judgment motion, including what specific causes of action can be brought under federal and state statutes, are not appropriate to resolve in a 12(b)(6) motion).

The Four Benefit Plans are different types of health plans, the purported anti-assignment clauses in those plans have different language, and applying the four clauses to their corresponding plans only highlights the need for discovery on the remaining claims to determine plan type. For example, Plan #1 and Plan #2 are non-ERISA Health Maintenance Organization ("HMO") plans. Plan #4 is a Medicare Advantage HMO plan. HH couches anti-assignment as primarily an ERISA defense, and it references Plans #1, #2, and #4 when arguing that the anti-assignment provisions defeat Saint Mary's derivative standing to sue under ERISA. *See* Motion at 8. The varied plan types highlight that the issue of which benefit plans apply to which of the 690 claims is proper for discovery, because different plans permit different causes of action and thus invite different legal analyses. HH's attempt at using a limited subset of anti-assignment

---

*aff'd*, 981 F.3d 664 (9th Cir. 2020). Saint Mary's plausibly alleges that HH failed to compensate under plan requirements to pay at the usual and customary rate. *See, e.g.*, 1AC ¶ 56 ("The 11% reimbursement Saint Mary's received [to treat A.W., a severely premature newborn] was far lower than the usual and customary rate that HH by law and its plan was required to pay.").

[13] *See, e.g.*, Plan #3.

clauses to achieve blanket dismissal cannot work; the anti-assignment provisions of four plans, even if the provisions were valid, cannot dismiss 690 claims at the pleading stage.

This is especially true because the anti-assignment provisions cited are not valid and do not bar assignment to Saint Mary's.  For example, Plan #3—the only ERISA plan that HH provided—is a self-funded ERISA Preferred Provider Organization ("PPO") plan that expressly honors Saint Mary's assignment of benefits.  While HH alleges this plan includes an anti-assignment provision, HH fails to include the first part of the provision, which provides: "***assignments of benefits to Hospitals, Physicians, or other providers of service will be honored***."  ECF No. 69, Ex. B at HTH000285 (emphasis added).  Plan #3 rearticulates special treatment of providers in another section of the plan: "***Except for assignments to providers of service***...no benefit payable under...the Plan will be subject to...assignment…" *Id*. at HTH000300. Plan #3 alone defeats dismissal because Saint Mary's adequately pleaded that it has a valid assignment that confers derivative standing to sue HH for ERISA benefits under Plan #3.

Further, the language of the clauses at issue in Plans #1-3 are ineffective against assignments of benefits to the provider of health benefits.  The alleged anti-assignment language in Plans #1 and #2 fails to make clear that it is intended to prevent assignments to health care providers, stating only that: "[y]ou may not assign this EOC or any of the rights, interests, claims for money due, benefits, or obligations hereunder without our prior written consent."[14]  Plan #3 also fails to clarify whether it prevents assignment to providers, stating: "The benefits provided under this Evidence of Coverage are for the personal benefit of the member and cannot be transferred or assigned."[15]  These provisions are even less detailed than the provision considered and rejected by the Fifth Circuit in *Hermann Hospital*: "[n]o employee, dependent or beneficiary shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment hereunder, and any such payment shall not be subject to any legal process to levy execution upon or attachment or garnishment proceedings against for the payment of any claims." *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959

---

[14] ECF No. 69, Ex. B at HTH000102, HTH000209.
[15] *Id*. at HTH000619.

F.2d 569, 574-75 (5th Cir. 1992), *overruled on other grounds by Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012) (interpreting the generic anti-assignment to apply "only to unrelated, third-party assignees—other than the health care provider of assignment benefits—such as creditors").[16]   HH's nonspecific anti-assignment provisions in Plans #1, #2, and #4 are distinguishable from the provision in *Spinedex*, which provided: "You may not assign your Benefits under the Plan to a non-Network provider without *our* consent."  *Spinedex*, 770 F.3d at 1296.  Of course the provision in *Spinedex* prevented assignment to out-of-network providers: it specifically said so.  *Id.*  HH's provision is analogous to the provision in *Hermann*; it lacks the specificity to prohibit an assignment to Saint Mary's.

### 4.   HH waived its anti-assignment defense.

Even if any claims did have valid anti-assignment clauses, HH waived the right to rely on the anti-assignment clauses by (under)paying Saint Mary's on these claims.  HH failed to assert or acknowledge the existence of anti-assignment clauses when it underpaid any of the claims in this case.  Thus, it cannot assert the anti-assignment clause as a defense to compelling it to pay the claim correctly now.  Courts reviewing the denial of benefits under ERISA are limited to the actual basis on which the administrator denied the claim, not its post-hoc rationalizations.  *Beverly Oaks Phys. Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 440 (9th Cir. 2020) (applying waiver to bar defendant from relying on the anti-assignment provisions where it held such reasons in reserve); *see also Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) (requiring plan administrators to provide specific reasons for denial because "[a] contrary rule would allow claimants…to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced.").  In both cases, Blue Cross attempted to raise alternative defenses to the members' benefit claims that it had not used to deny the members' claims.  *See Beverly Oaks*, 983 F.3d at 440; *Harlick*, 686 F.3d at 720.  In

---

[16] Courts outside of the Fifth Circuit have found *Hermann* persuasive in construing similarly generic anti-assignment clauses as ineffective.  *Fairview Hosp. v. Fortune*, 750 N.E.2d 1203, 1207 (Oh. App. 8th Dist. 2001) ("We read this in the same fashion as did the court in *Hermann*"); *Univ. of Tennessee William F. Bowld Hosp. v. Wal-Mart Stores, Inc.*, 951 F. Supp. 724, 730-32 (W.D. Tenn. 1996) (anti-assignment clause, read in light of *Hermann* and other authority, did not clearly invalidate assignment); *Sidlo v. Kaiser Permanente Ins. Co.*, No. 16-00073 ACK-KSC, 2016 WL 6821787, at *7-10 (D. Haw. Nov. 17, 2016) ("The Court is guided by the Fifth Circuit's reasoned approach to anti-assignment provisions, and finds that the evidence here supports that approach…").

both cases, the Ninth Circuit refused to recognize the alternative defenses and held that Blue Cross was limited to the basis on which it had denied the claim. *Beverly Oaks*, 983 F.3d at 442; *Harlick*, 686 F.3d at 721.  In this case, HH denied or underpaid Saint Mary's claims without asserting any anti-assignment basis thereby waiving the right to deny payment to Saint Mary's based upon the anti-assignment. *See Beverly Oaks*, 983 F.3d at 440; *Harlick*, 686 F.3d at 720.

HH argues further its policies do not prohibit "directly paying benefits to providers," and so HH claims it did not waive its anti-assignment defense regarding the right to sue when it partially paid the claims. *See* Motion at 10.  First, this shows the absurdity of HH's insistence that there is a difference between the right to receive payment of benefits and the right to sue to recover those same benefits.  HH is not raising anti-assignment solely as a defense to standing; it is raising it now for the very first time to deny benefits *because the benefits are the subject of claims at issue in this lawsuit*.[17]  This scam would be disastrous if allowed to succeed: an insurer could lull providers into accepting their out-of-network patients by paying claims pursuant to valid assignments (at rates lower than their own plans require) but then secure dismissals of any suits to enforce their own plan terms by invoking surprise anti-assignment clauses.  It is easy to see, despite HH's sleight of hand, that this is what the Ninth Circuit prohibited in *Beverly Oaks*.

Finally, to the extent HH argues the 1AC "lacks any allegations to support ERISA estoppel," Saint Mary's pleaded that it provided HH with notice that it is the assignee of the patients, that HH made payments without raising the anti-assignment provisions, and that the versions of the anti-assignment clauses are too vague to be applied against Saint Mary's.  *See* 1AC ¶ 63-65.  In doing so, Saint Mary's successfully pleaded it was plausible that HH alone knew about the anti-assignment provisions; that Saint Mary's detrimentally relied on HH's acquiescence of the patients' assignments of benefits to its detriment because Saint Mary's would have reasonably expected HH to raise anti-assignment then as a defense to payment; and that the anti-assignment provisions at issue are ambiguous.  This is all that was required of

---

[17] *Cf. Eden Surgical Ctr. v. Cognizant Tech. Sols. Corp.*, 720 F. App'x 862, 863 (9th Cir. 2018) ("Defendants raised the anti-assignment provision after the suit commenced to contest Eden's standing to sue, not as a reason to deny benefits. In fact, as the district court properly noted, no benefits were payable here because the beneficiary's deductible had not been met.").

Saint Mary's to succeed in an estoppel theory.  *See Beverly Oaks*, 983 F.3d at 442-43.

### 5. The Anti-Assignment Clauses Violate Nevada Law, which HH's plans incorporate.

Nevada law requires individual health insurance plans to provide for the assignability of benefits. NRS 689A.135 ("A person insured under a policy of health insurance may assign his or her right to benefits to the provider of health care who provided the services covered by the policy."); *see also id.* at 689A.040 (mandating individual insurance policies contain "provisions specified in NRS 689A.050 to 689A.170, inclusive"). Nevada law also requires HMO providers to pay facilities directly regardless of the assignment of patient benefits.  *See* NRS 695C.185. Plans #1 and #2 are HMO plans governed under Nevada state law and incorporate "any provision that is required to be in this EOC by state or federal law...whether or not set forth in this EOC." ECF No. 69, Ex. B at HTH000103, HTH000210. If anything, therefore, the Four Benefits Plans at a minimum show it is likely that the majority of claims are not subject to anti-assignment provisions, since HH either incorporated Nevada law into its policies, or is violating Nevada law by failing to permit assignment.

## B.   ERISA does not preempt Saint Mary's claims.

HH also moves to dismiss Saint Mary's state and common law claims (Counts 2-6) on the basis of ERISA preemption, but provides little to no substantive explanation for that argument.  There are two forms of ERISA preemption: complete preemption under 29 U.S.C. § 1132, and conflict preemption under 29 U.S.C. § 1144(a).  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208-209 (2004).  Complete preemption under ERISA is not a basis for dismissal of a cause of action; rather, it is a basis for federal jurisdiction as it renders facially state-law based claims removable to federal court.  *Davila*, 542 U.S. at 209-210; *Marin v. Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009) (finding complete preemption under § 502(a) "really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances...") (citations omitted).

Conflict preemption under Section 1144(a) preempts all state laws that "relate to any employee benefit plan" subject to ERISA. 29 U.S.C. § 1144(a).  Section 1144 contains three provisions relating to preemption: (1) Subsection (a) preempts all state laws that "relate to any

employee benefit plan" subject to ERISA (the "Preemption Clause"); (2) Subsection (b)(2)(A), the "Saving Clause," exempts from preemption "any law of any State which regulates insurance, banking, or securities"; and (3) Subsection (b)(2)(B), the "Deemer Clause," exempts from the saving clause laws that deem an ERISA plan "to be an insurance company or other insurer...or to be engaged in the business of insurance...for purposes of any law of any State purporting to regulate insurance companies."

As to the Preemption Clause, a state law "relates to" a covered employee benefit plan if it has a "reference to" or "connection with" it. *Cal. Div. of Labor Standards Enf't v. Dillingham Constr. N.A. Inc.,* 519 U.S. 316, 324 (1997). A state law has a "reference to" an employee benefits plan when it "acts immediately and exclusively upon ERISA plans...or where the existence of ERISA plans is essential to the law's operation." *Id. at* 325. As to the Saving Clause, a state law has a "forbidden connection" with ERISA plans if it falls outside the scope of state laws that Congress understood would survive ERISA or if its effect is to bind ERISA claims. *Assoc. Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 984 (9th Cir. 2004). If a cause of action relates to an employee benefit plan under this first prong, it is *saved* from ERISA preemption doctrine if the law "regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). The Supreme Court has created a two-part test that provides that a state law is within this saving clause if it is (1) "specifically directed toward entities engaged in insurance," and (2) if it "substantially affect[s] the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n. of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42 (2003). Finally, the Deemer Clause is applicable only to the self-funded ERISA plans and dictates that an employee benefit plan itself is not deemed to be an insurance company and, as such, is not subject to state regulation.[18] *See FMC Corp. v. Holiday*, 489 U.S. 52, 61 (1990).

ERISA preemption is an affirmative defense; thus, HH bears the burden to prove ERISA preemption bars Saint Mary's claims. *Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988) ("the burden is on the defendant to prove the facts necessary to establish" a defense of ERISA preemption). Even with the Four Benefits Plans, HH has failed to identify

---

[18] It is thus not necessary to discuss the application of the Deemer Clause to the fully-insured ERISA plans.

even one of the 690 claims at issue as preempted.  Its affirmative defense, on which Saint Mary's

bears no burden, therefore fails *ab initio*.  It also fails for the following additional reasons.

> **1.  ERISA does not preempt the Emergency Care Statutes (Count 5) or Nevada Prompt Pay Statute (Count 6) because they affect the risk pooling arrangement and are saved from preemption under Section 1144(b)(2)(A).**

The Emergency Care Statutes and Nevada Prompt Pay statutes are not preempted by

ERISA because the Saving Clause saves them from preemption.  Both statutes are (1)

"specifically directed toward entities engaged in insurance," and (2) "substantially affect the risk

pooling arrangement between the insurer and the insured." *Miller*, 538 U.S. at 341-42.

*First*, the Emergency Care Statutes point directly at insurers.  HH is an "Insurer" under

the Nevada Insurance Code. NRS 679A.100. In its role as an Insurer, HH is required to "provide

coverage for medically necessary emergency services," with "medically necessary emergency

services" being defined as services provided "to an *insured* by a provider of health care.  NRS

695G.170.  Nevada's Prompt Pay Statute is also directed at insurers, since it regulates when

administrators are required to pay claims.  *See Am.'s Health Ins. Plans v. Hudgens*, 915 F. Supp.

2d 1340, 1361 (N.D. Ga. 2012) (finding Georgia's Prompt Pay Statute "directed toward entities

engaged in insurance" because it applies to health plans and insurance policies).

*Second*, the Emergency Care Statutes and the Nevada Prompt Pay Statutes "substantially

affect the risk pooling arrangement between the insurer and the insured."  *Miller*, 538 U.S. at

341-42. A state statute  substantially affects the risk pooling arrangement between  the  insurer

and the insured when it impacts the terms by which insurance providers must pay plan members.

*Rudel v. Hawai'i Mgmt. All. Ass'n*, 937 F.3d 1262, 1274 (9th Cir. 2019) (finding state statutes

to substantially affect risk pooling where they caused insurers to face more risk than they would

without the statutes), *cert. denied*, 140 S. Ct. 1114 (2020); *Standard Ins. Co. v. Morrison*, 584

F.3d 837*,* 845 (9th Cir. 2009) (where the state statute would lead to a greater number of claims

being paid, more losses would be covered, thus affecting risk pooling).  In *Miller*, the state passed

an "Any Willing Provider" ("AWP") statute, which forbade insurance companies from

discriminating against any doctor who was willing to meet the terms and conditions of the health

plan.  538 U.S. at 331-332.  This affected the risk pool because it expanded the number of

providers from whom an insured may receive health services, thus "alter[ing] the scope of permissible bargains between insurers and insureds." *Id.* at 338–39.

Here, Section 695G.170 of the Nevada Insurance Code requires coverage of medically necessary emergency services regardless of hospital. NRS 695G.170. This expands the number of providers from whom an insured may receive covered health services. The Emergency Care Statutes thus alter the scope of the permissible bargains between insurers and insureds. Moreover, a state law that impacts the timing of when an insurance company must pay for claims can have a substantial effect on the risk pooling arrangement. *See Hudgens*, 915 F. Supp. 2d at 1361 (finding Georgia's Prompt Pay Statute substantially affects the risk pooling arrangement because it imposes a timeliness requirement between the insurer and the insured), *aff'd*, 742 F.3d 1319, 1333 (11th Cir. 2014) (acknowledging "the similarities between Georgia's prompt-pay requirements…in that they all affect the rights and duties of the parties under the terms of a policy"). Accordingly, there is at least a fact issue regarding whether Nevada's Prompt Pay Statute alters the scope of the permissible bargains between the insurers and insureds. *See Munda*, 267 P.3d at 773. Because the saving clause saves the Emergency Care Statutes from ERISA conflict preemption, HH's Motion regarding preemption on Count 5 should be denied.[19]

### 2. ERISA does not preempt Saint Mary's Quantum Meruit (Count 4) claim because the Emergency Care Statutes provide an independent legal basis.

Saint Mary's asserts its Quantum Meruit claim *independently* (not as assignee under ERISA). Its independent rights under the Emergency Care Statutes as a provider—or as a service provider under the Court's equitable powers—do not disappear just because it also has the patients' rights as assignee. *See Meadows v. Emp'rs Health Ins.*, 47 F.3d 1006, 1008-09 (9th Cir. 1995) (claims of a third party who sues independently not preempted under ERISA). Thus, Saint Mary's Quantum Meruit claim does not "relate to" ERISA benefits and is not preempted.

---

[9] There is certainly at least a *fact issue* regarding whether these statutes are saved from preemption. *See Munda*, 267 P.3d at 773 (finding preemption analysis a "fact-intensive inquiry because ERISA preemption is dependent on the actual operation of a state statute"). To the extent that HH argues that the "deemer clause" in 29 U.S.C. § 1144(b)(2)(B) exempts from the Savings Clause any self-funded ERISA plans, Saint Mary's pleaded that its monetary damages exceed what any ERISA plan would have covered due to HH's administration. 1AC ¶ 102. For such self-funded ERISA claims, Saint Mary's seeks to recover for services based on HH's authorization of the services, not based on the members' insurance coverage; thus, such claims by Saint Mary's do not "relate to" any ERISA plan such that they would be preempted by ERISA and the deemer clause would even apply.

**C.     All of Saint Mary's claims are adequately pleaded.**

Saint Mary's Complaint, which incorporates its Claims List (which HH has in its possession), sets out all of the claims with specificity. HH has notice of exactly which claims are at issue (and did at the time this Motion was filed).  Further, HH's Motion fails to distinguish between the separate theories alleged by Saint Mary's: that (1) Saint Mary's assignments and HH's own policies, through ERISA and contract law; (2) the Nevada Emergency Care Statutes; and/or (3) Quantum Meruit all require HH to reimburse Saint Mary's at the usual and customary rate.  These distinct, valid avenues of recourse necessitate discovery because the applicable legal theories depend upon the type of claim at issue.[20]

**1.     Saint Mary's adequately pleaded its ERISA claims.**

In arguing that Saint Mary's has failed to adequately plead an ERISA violation, HH first claims that "nowhere in the [1AC] does Saint Mary's identify any plan provisions that entitle the participants to the additional benefits Saint Mary's seeks in the form of damages—i.e., the full amount of billed charges." Saint Mary's plausibly alleged that the plans require HH to pay at the "'usual and customary' rate or at a rate derived therefrom" and that HH underpaid the Claims. *See, e.g.*, 1AC ¶¶ 28, 38. Saint Mary's also pleaded that Plan #3, the only ERISA plan that HH provided, stated: "If a Covered Person must use the services of a Non-PPO provider in an Emergency, any such expenses will be paid at the PPO benefit level.  The PPO benefit level will be applied using Usual, Customary and Reasonable as determined by the Plan."[21]  Taking all of Saint Mary's allegations as true, as is proper at the 12(b)(6) stage, *Symington*, 51 F.3d at 1484, the Court must assume that Saint Mary's is correct that the insurance plans at issue, whether ERISA or non-ERISA, required reimbursement at a market rate for out-of-network services rendered by providers like Saint Mary's. Throughout the 1AC, Saint Mary's alleges that the claims were underpaid under the contracts' own provisions. *See* 1AC ¶¶ 19, 27-38, 40, 47, etc. And Saint Mary's did not just assert that what it was paid was below the market rate—it alleged

---

[20] Saint Mary's pleaded that it lacks this information and has requested such information multiple times.  As for the claims for which Saint Mary's can specifically identify the claim type, for the Four Benefit Plans, Saint Mary's has plead additional specificity.

[21] ECF No. 69, Ex. B at HTH000232.

that the average rate for the claims on the list, even excluding unpaid claims, was around 20%, which it further alleges, based on its long-term experience as a healthcare provider, is far below what the market requires for out-of-network services, emergency or otherwise. *See* 1AC. ¶ 38.

Except for the Four Benefit Plans, HH has exclusive control over the plan documents at issue. Saint Mary's cannot determine which type of plan applies to each of the 690 claims, but this is not a basis for dismissal:  Saint Mary's pleaded that ***for each claim, if the underlying plan was an ERISA plan, then HH's failure to pay the benefit the plan requires was a denial of assigned ERISA benefits; if the plan was not an ERISA plan, then HH's failure to pay the required amounts under the plan was a breach of assigned contract rights.*** Saint Mary's has alleged facts sufficient to demonstrate that HH would be liable, *regardless* of the type of plan.

### 2.  Saint Mary's adequately pleaded its contract claims.

HH further argues that Saint Mary's has not adequately alleged assignment of breach of contract claims, because the exemplar assignment listed in the Complaint refers only to benefits. As argued in Section IV.A.1., *supra*, in Saint Mary's assignments, the patient explicitly assigns the right to receive payment of benefits, which confers standing for reimbursement claims on the hospital.  *Spinedex*, *Bristol SL Holdings*, and other authority foreclose HH's arguments that an assignment of benefits is insufficient to confer standing to sue.  For each of the 690 claims, at least one theory of liability would apply, rendering dismissal improper.

### 3.  Saint Mary's stated a viable claim for contract implied-in-law.

HH argues that Saint Mary's contract implied-in-law claim should be dismissed, citing to a case that was ultimately about *preemption* rather than the inability to support an implied-in-law contract claim.  *See Emerg. Group of Ariz. Prof'l Corp. v. United Healthcare Inc.*, 448 F. Supp. 3d 1077, 1085-86 (D. Ariz. 2020), *rev'd and remanded*, 838 Fed. App'x. 299 (9th Cir. 2021) (deciding that implied-in-law contract theory did not support state law remand, and was subject to dismissal under ERISA preemption).  That same case was *reversed* by the Ninth Circuit for remand to state court because the Ninth Circuit found that the implied-in-law contract theory *was* a separate, valid, state-law claim independent of ERISA.  *Emerg. Group of Az. Prof'l Corp. v. United Healthcare, Inc.*, 838 Fed. App'x 299, 300 (9th Cir. 2021) ("The Medical Groups

assert legal duties arising under an implied-in-fact contract...[t]hese alleged legal duties 'would exist whether or not an ERISA plan existed' and thus are independent from the legal obligations imposed by the ERISA plans.").  HH provides no other basis for its claim that the implied-in-law contract theory is inadequately pleaded.

Saint Mary's alleged that by verifying benefits, authorizing medical services, indicating that the services were medically necessary, and/or providing information to Saint Mary's regarding benefits to be expected, HH agreed to pay for services provided to their members directly to Saint Mary's, separately and apart from any obligations to their members. Saint Mary's further alleges this conduct communicated HH's willingness to accept the market or usual and customary rate for the services provided.  This conduct gave rise to the implied-in-law contract, and Saint Mary's alleged the breach of that contract (by failure to pay at market rates), and alleged the consideration for the contract (the provision of out-of-network services).  The Nevada Supreme Court recently refused to disturb denial of a dismissal motion under Nevada Rule 12(b)(5) (corresponding to Federal Rule 12(b)(6)) regarding an implied-in-law contract claim for payment for emergency services rendered out-of-network.  *United Healthcare Ins. Co. v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 81680, 2021 WL 2769032, at *2 (Nev. July 1, 2021); *see also Fremont Emerg. Servs. (Mandavia), Ltd. v. UnitedHealth Group, Inc.*, 446 F. Supp. 3d 700, 703 (D. Nev. 2020).[22]  Nevada law would apply to this implied-in-law contract, and the Nevada Supreme Court has explained why HH's Motion should be denied:

> The providers alleged an implied-in-fact contract to provide emergency medical services to United's plan members in exchange for payment at a usual and customary rate, and that United breached this contract by not doing so.  As the theory suggests, these determinations are factually intensive and ill-suited for a motion to dismiss or writ proceeding.

*United Healthcare*, 2021 WL 2769032, at *2.

### 4.  Saint Mary's Emergency Care Statutes claim should not be dismissed.

As an initial matter, HH has not argued that Nevada law does not require HH to pay Saint Mary's for emergency care; further, recovery under this theory is not dependent upon an

---

[22] Saint Mary's believes this was the remand that put the case before the Eighth Judicial District; the district court notes that the plaintiffs had never had a reimbursement contract with the insurer, making them out-of-network.

assignment.[23]   Instead, HH argues that the Emergency Care Statutes only require it to pay what *it* thinks is fair and reasonable for emergency care.  *See* Motion at 20.  Nevada's requirement that all managed care organizations provide coverage for "medically necessary emergency services" is not new—it has been on the books in its present form since 1999.  NRS 695G.170.  Section 439B.748 is instructive of the Legislature's intended meaning of the coverage of "medically necessary emergency services."  And Sections 439B.748, 439B.751, and 439B.754 show an intent by the Legislature *not* to permit the insurer to force *de minimis* payments on non-contracted providers—Section 439B.748 provides that recently out-of-network providers will be paid *more* than they were paid in-network, and provides that while the insurer can pay a long term non-network provider a "fair and reasonable" amount, it permits the provider to force an arbitration in the event the payment is unreasonable.  Section 439B.751 provides that, for non-network, non-emergency facilities, the third party (here, HH) "shall submit to the out-of-network provider an offer of payment in full for the medically necessary emergency services."

Section 695G.170 requires HH to "provide coverage for medically necessary emergency services provided at any hospital," and thus this provision alone requires HH to pay for the emergency care provided by Saint Mary's.  Section 439B.748 shows a legislative intent to ensure the parties cooperate in determining a fair market rate, like the usual and customary rate.  In any event, uncertainty about the scope and procedural impact of this law is not cause for dismissal.

**5.   The Unjust Enrichment/Quantum Meruit claims should not be dismissed.**

Here again, HH has not argued that Nevada common law does not require HH to pay Saint Mary's for emergency care, and recovery under this theory is not dependent upon an assignment.[24]   HH undercompensated Saint Mary's relative to what was minimally required under the member plans, and HH outright denied payment for other claims. HH argues simply that there can be no unjust enrichment without a benefit and cites to New York authority that tends to suggest that health insurers are not "benefited" when an insured is treated by a facility.

---

[23] In fact, as plead and argued above, Saint Mary's alleges that the Nevada Emergency Care Statute provide an independent basis for relief that does not rely upon the standing of the patient-insureds.
[24] In fact, as plead and argued above, Saint Mary's alleges that quantum meruit provides an independent basis for relief that does not rely upon the standing of the patient-insureds.

*See* Motion at 14-15. In contradistinction to HH's authority, in this circuit, in *Goel v. Coalition Am. Holding Co.*, the plaintiff alleged that class members "conferred benefits...by providing healthcare services to patients" and that Defendants (administrators of a PPO plan) "have reaped the benefit of substantial monetary savings by wrongfully and illegally applying discounted rates to medical expense claims." CV 11-2349 GAF (EX), 2011 WL 13128300, at *6 (C.D. Cal. July 5, 2011).  The court found this stated a plausible benefit for the purposes of an unjust enrichment claim.  *Id.*[25]  Other non-New York courts have similarly held that provision of services to an insured is a benefit to the insurer for the purposes of unjust enrichment.[26] Still other courts have "split the baby," finding a benefit was conferred where the provider had to provide the services because they were emergency services.[27]

HH's view of "benefit" is short-sighted, and fails to acknowledge that in plans that have out-of-network benefits, like PPO plans, the value of HH's out-of-network benefits to its members goes down if providers *refuse* to provide coverage to patients of a particular insurer— this necessarily makes the plans themselves less valuable.  With the exception of emergency care, Saint Mary's is under no obligation to treat HH members, but its willingness to do so is a benefit to HH, since it permits HH to sell a product to members who do not want to be locked into an HMO or a particular network of limited providers.[28]

HH's argument also fails to acknowledge that it has *extracted* a benefit from Saint Mary's by paying Saint Mary's less than it would have had to pay had the members received their services in-network.  Under the exemplar EOC, HH claims it does not have to pay anything.  HH also apparently argues (Saint Mary's does not concede it is correct) that Saint Mary's cannot

---

[25] Indeed, although this Court dismissed an unjust enrichment claim in *Valley Health System LLC v. Aetna Health* in part for failure to plead a benefit, this Court distinguished an unjust enrichment claim where, as here, the provider pleads that the compensation was lower than required by the insured's health plan. *Valley Health Sys. LLC v. Aetna Health, Inc.*, 215CV1457JCMNJK, 2016 WL 3536519, at *4 (D. Nev. June 28, 2016) ("Valley Health has not alleged that Aetna failed to reimburse Valley Health at levels commensurate with its individual members' coverage."). Here, unlike in *Valley Health*, Saint Mary's does allege that Aetna obtained an unjust benefit by reimbursing at a lower level than required by the plan.

[26] *E.g.*, *Demaria v. Horizon Healthcare Services, Inc.*, 2:11-CV-7298 WJM, 2013 WL 3938973, at *6 (D.N.J. July 31, 2013); *Surgery Ctr. of Viera, LLC v. UnitedHealthcare, Inc.*, 465 F. Supp. 3d 1211, 1224 (M.D. Fla. 2020); *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003).

[27] *New York City Health & Hosps. Corp. v. Wellcare of New York, Inc.*, 937 N.Y.S.2d 540, 546 (Sup. Ct. 2011).

[28] *See* Plan # 3 (providing specifically for out-of-network benefits).

balance bill.  Motion at 8 ("Nor can it balance bill these patients").  Saint Mary's confers on HH a benefit equal to the amount it would normally pay an in-network facility to provide the same services every single time it provides out-of-network services to anyone covered under the exemplar EOC (if that EOC applies to any of the claims at all, which HH itself refuses to say). It is clearly a benefit to HH for its patients to obtain valuable medical services which HH does not have to pay for, and it is unjust for HH to retain that benefit.

### 6. HH ignores the attorney fees provision in Nevada's Health Insurance Prompt Payment Statute that evidences a right of private action.

HH argues that NRS 683A.079 does not contain a right of private action by incorrectly analogizing this statute to the property/casualty prompt payment provision in Section 690B.012. In *Allstate*, cited by HH, the Nevada Supreme Court found that, absent a clear private right in the statute, the statute defaulted to being enforceable by the Department of Insurance.  *Allstate Ins. Co. v. Thorpe*, 123 Nev. 565, 571-73 (2007).  And if Section 683A.079 were written as Section 690B.012 was, then the proper procedure for pursuing this claim may have been for Saint Mary's to file a grievance with the Nevada Insurance Commissioner.

But unlike Section 690B.012, Section 683A.079 contains an attorney fee provision providing that Prompt Pay actions will be brought in *court*, not before an administrative commissioner: "5. A court shall award costs and reasonable attorney's fees to the prevailing party in an action brought pursuant to this section."  NRS 683A.0879.  It is this right to attorney fees that confers the right to sue.  *See Csomos v. Venetian Casino Resort, LLC*, 55203, 2011 WL 4378744, at *2 (Nev. 2011) (finding a right of private action in a statute that does not expressly provide the right to sue but "allows for assessment of attorney fees," because "[i]t is doubtful that the Legislature intended a private cause of action to obtain attorney fees for an unpaid wages suit but no private cause of action to bring the suit itself.").

Saint Mary's has also sufficiently alleged the violation of this statute because its Claims List identifies each and every claim at issue in this case.  HH can determine from this spreadsheet which claims were not timely paid with relative ease, starting with the claims which HH never paid at all (making these *128 claims* especially late, since they would each be more than a year old, as HH can determine by sorting the claims by date of discharge).

1    **D.      Saint Mary's claims are not barred for failure to exhaust remedies and appeals.**

2          HH's Motion is based on the notion that, no matter how egregious HH's conduct, and

3    despite no written contractual agreement between the parties requiring it, Saint Mary's must

4    follow HH's appeals procedures to receive payment.    But (1) Saint Mary's right to

5    reimbursement is not conditioned on compliance with any appeals process; and (2) the issue of

6    exhaustion of administrative remedies is an affirmative defense for HH to plead and prove.

7          **1.    Saint Mary's right to reimbursement is not conditioned on HH's appeals process.**

8          By failing to pay the usual and customary rate under the Emergency Care Statutes, HH

9    breached *first* and now attempts to condition Saint Mary's right to reimbursement on a non-

10   contractual requirement to appeal.   HH cannot unilaterally condition its compliance with the

11   Emergency Care Statutes on whether Saint Mary's appeals.   For the emergent claims, the Nevada

12   Insurance Code applies and cannot be abrogated by the lack of an appeal that the statutes do not

13   require. The Legislature could have required that a non-participating provider complete an

14   insurer's appeal process before filing suit, but it chose not to do so.   *Cf.* NRS 439B.754 (effective

15   Jan. 1, 2020, requiring non-participating providers to participate in a state-required mediation or

16   arbitration process before filing suit).   There are simply no administrative remedies to exhaust,

17   and the exhaustion doctrine therefore has no relevance here.

18         **2.    Saint Mary's need not plead exhaustion of administrative remedies.**

19         Saint Mary's is not required to plead exhaustion of administrative remedies in its

20   complaint, given that failure to exhaust is an affirmative defense on which the Defendant bears

21   the burden of pleading and proof.   *Albino*, 747 F.3d at 1166 (administrative exhaustion generally,

22   noting that a 12(b)(6) motion is appropriate on the defense of failure of exhaustion only in the

23   "rare event that a failure to exhaust is clear on the face of the complaint."); *Norris v. Mazzola*,

24   15-CV-04962-JSC, 2016 WL 1588345, at *6 (N.D. Cal. Apr. 20, 2016) (ERISA exhaustion is

25   an affirmative defense, declining to grant a 12(b)(6) motion on exhaustion because the defense

26   did not appear on the face of the complaint); *Puget Sound Surgical Ctr., PS v. Aetna Life Ins.*

27   *Co.*, C17-1190JLR, 2018 WL 4852625, at *6 (W.D. Wash. Oct. 5, 2018) ("[h]as [plaintiff]

28   pleaded itself out of its ERISA claim by alleging facts consistent with a failure to exhaust

administrative remedies related to Sound Health?  It has not.  ***Indeed, [plaintiff] need not plead any facts to negate an affirmative defense.***") (emphasis added).  Saint Mary's 1AC does not show that it failed to exhaust; consequently, HH's affirmative defense should be denied.

In any case, Saint Mary's adequately pleaded exhaustion of administrative remedies.  Even before *Albino* settled the question of whether an administrative exhaustion was proper to present at the motion to dismiss stage, it was sufficient in the Ninth Circuit for plaintiffs to plead shortly and plainly that they had exhausted their administrative remedies.  *See*, *e.g.*, *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 661 F. Supp. 2d 1076, 1102 (D. Ariz. 2009).  In fact, the *Spinedex* court distinguished the cases cited by HH:

> ...The trend among the district courts appears to grant plaintiffs more lee-way than *DeVito,* only dismissing ERISA claims for failure to adequately plead exhaustion when the complaint does not refer to administrative procedures, but rather alludes vaguely to meeting all conditions precedent or fails to mention exhaustion at all.

*Spinedex*, 661 F. Supp. 2d at 1102-03.

In addition to the concerns above, under Ninth Circuit precedent, ERISA's court-created exhaustion requirement applies only if the relevant plan requires exhaustion.  *Spinedex*, 770 F.3d at 1299.  Where plan documents could reasonably be read as making the administrative appeals process optional, exhaustion is not required. *See id.* at 1298-99.  What exhaustion procedures are required is thus a presently undecidable fact question.

## V.     REQUEST FOR LEAVE TO REPLEAD

Should the Court agree with any part of HH's analysis, Saint Mary's respectfully requests the Court grant it leave to replead.  Federal Rule of Civil Procedure 15(a) provides that courts considering motions for leave to amend pleadings "freely give leave when justice so requires."  "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant…, undue prejudice to the opposing party…—the leave sought should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

///

///

///

## VI.    CONCLUSION

For the reasons stated above, Saint Mary's requests that the Court deny HH's Motion in its entirety, or in the alternative, grant Saint Mary's leave to replead.

Dated: January 21, 2022                         SNELL & WILMER L.L.P.

By: */s/ Janine C. Prupas*
William E. Peterson, Bar No. 1528
Janine   C.   Prupas,   Bar   No.   9156
50   West   Liberty   Street,   Suite   510
Reno, Nevada  89501
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** with the Clerk of the Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED this 21st day of January, 2022.

*/s/ Maricris Williams*
An employee of Snell & Wilmer L.L.P.

4861-2611-9690